A93A0584. DAVIS v. CONCORD COMMERCIAL
CORPORATION.
(434 SE2d 571)

SMITH, Judge.

Davis was the president of Benafuels, Inc., which conducted coal mining operations in West Virginia. Benafuels entered into three separate agreements with Ingersall-Rand Financial Corporation (IRFC) to secure the purchase money financing of three coal mining machines. See OCGA § 11-9-107 (b). Contemporaneously with the execution of the first security agreement, Davis entered into an agreement guaranteeing "absolutely and unconditionally . . . the payment of all liabilities of [Benafuels, Inc.] to IRFC of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by IRFC by assignment or otherwise, whether matured or unmatured and whether absolute or contingent, irrespective of any invalidity therein, the unenforceability thereof or the insufficiency, invalidity or unenforceability of any security therefor. . . . This guaranty is a continuing guaranty . . . in full force and effect irrespective of any interruptions in the business relations of [Benafuels, Inc.] with IRFC." By giving written notice, Davis could terminate his responsibility as to all liabilities of Benafuels incurred by it or acquired by IRFC. Any such termination would become effective 30 days after receipt of the written notice. In the guaranty agreement, Davis waived all further notice, any demand for payment, the benefit of any exemp-

tion, and all set-offs and counterclaims. The agreement stated that any reference to IRFC was expressly inclusive of its successors and assigns. After Benafuels went through liquidation proceedings in federal bankruptcy court, Concord Commercial Corporation (CCC), as successor-in-interest to IRFC, sued Davis on his guaranty in this contract action to recover the balance of the purchase price of the three coal mining machines. The case was tried before a jury which returned a verdict in favor of CCC against Davis. He appeals from the judgment entered by the trial court on the jury's verdict.

1. Immediately before trial, Davis moved to dismiss pursuant to OCGA § 9-11-12 (h) (3), arguing that the remedy sought was beyond the subject matter jurisdiction of the State Court of Fulton County. The denial of this motion is enumerated as error.

Davis's motion was based upon the fact that prior to the sale of the first coal mining machine, IRFC created several wholly-owned subsidiaries and transferred to them all of the assets of IRFC. He argues that since one subsidiary, IRFC Leasing 16 Corporation, was the true owner of the mining machines at issue at the time Benafuels entered into its first security agreement and Davis executed the guaranty, no interest remained for IRFC to convey to Benafuels. He contends that CCC effectively was seeking equitable reformation of the contracts, a remedy beyond the jurisdiction of the state court. See OCGA § 23-1-1. CCC, on the other hand, argues that the identification of IRFC rather than the recent assignee, IRFC Leasing 16 Corporation, as the creditor was a mere misnomer due to the use of an old form agreement which had not been updated to reflect the creation of IRFC Leasing 16 Corporation. CCC urges that this misnomer merely created a jury question of contract construction as to the true intent of the parties rather than an issue of equitable reformation of the writing to alter its terms.

"The term 'successor' means, ordinarily in the case of a corporation, another corporation which by a process of amalgamation, consolidation, or duly authorized legal succession has become invested with the rights and has assumed the burdens of the first corporation. A legal assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, chattel, or other thing." (Citations, punctuation, and footnote omitted.) *Southern Patrician Assoc. v. Intl. Fid. Ins. Co.*, 191 Ga. App. 106, 107-108 (381 SE2d 98) (1989). It is undisputed that CCC is the successor of IRFC because of a transfer of all the stock in IRFC to CCC. It is further undisputed that IRFC Leasing 16 Corporation also assigned all interest in the security agreements with Benafuels to CCC. However, neither of these transactions alone would suffice to make Davis liable to CCC under the continuing guaranty,

unless the debt sought to be enforced had also been acquired by IRFC.

Assuming, arguendo, that IRFC Leasing 16 Corporation alone had title to convey as a *seller*, nevertheless, IRFC itself became a *creditor* of Benafuels, within the scope of Davis's guaranty agreement, by virtue of its status as the sole shareholder of IRFC Leasing 16 Corporation at all pertinent times. In Georgia, the common law doctrine of corporate continuity applies where, as here, there is a substantial identity of ownership and a complete identity of the objects, assets, shareholders, and directors. See *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (328 SE2d 726) (1985). See also *Johnson-Battle Lumber Co. v. Emanuel Lumber Co.*, 33 Ga. App. 517 (1) (126 SE 861) (1925). IRFC acquired an existing debt obligation of Benafuels's and became its creditor "by assignment *or otherwise*." The substantive rights in that indebtedness were then properly assigned to CCC through the subsequent sale of all the stock in IRFC. There is no need for equitable reformation of any writing, and so the trial court did not err by refusing to dismiss this contract action as being beyond the subject matter jurisdiction of the State Court of Fulton County under OCGA § 9-11-12 (h) (3).

2. Consideration moved to the principal, Benafuels, by the extension of credit to finance the purchase price of the mining machines. See OCGA § 10-7-1. Davis's contention that the guaranty is unenforceable owing to a total failure of consideration is without merit. *Virgil v. Kapplin*, 187 Ga. App. 206, 208 (3) (369 SE2d 808) (1988). As to his further contention that the debt evidenced by the security agreement is itself unenforceable, Davis waived any challenge to the validity of the underlying indebtedness in his promise of guaranty, rendering this claim irrelevant.

3. At the close of the evidence, the trial court granted a partial directed verdict in favor of CCC as to the commercial reasonableness of the disposition of the collateral, with the issue of damages remaining for jury determination. This ruling is enumerated as error.

The Uniform Commercial Code — Secured Transactions, OCGA § 11-9-101 et seq., provides the framework for any recovery of the balance of the purchase price after a secured party has repossessed and disposed of collateral securing the debt. Pursuant to OCGA § 11-9-504, a secured party after default may sell, lease, or otherwise dispose of any or all of the collateral. The secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. Disposition of the collateral may be by public or private proceedings at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Reasonable notification of the time and place of any public sale or of the time after

which any private sale or other intended disposition is to be made shall be sent to the debtor. A guarantor of secured indebtedness, under a separate contract, also is a debtor within the meaning of OCGA § 11-9-504 (3) and is not bound by his own or the debtor's pre-default waiver of the right to notice of disposition or pre-default waiver of the commercial reasonableness of any disposition of the collateral. *Branan v. Equico Lessors*, 255 Ga. 718, 722 (6), (7) (342 SE2d 671) (1986); OCGA § 11-9-501 (3). OCGA § 11-9-507 (2) provides definitive but not exclusive examples of commercial reasonableness: "If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. . . . A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable. . . ."

Should the debtor contest the reasonableness of the creditor's actions, compliance with OCGA § 11-9-504 (3) is a condition precedent in an action to recover the difference between the contract price and the amount of the unpaid balance. *Farmers Bank &c. v. Hubbard*, 247 Ga. 431, 434 (276 SE2d 622) (1981); *Branch v. Charlie Pike Chevrolet-Buick*, 198 Ga. App. 672, 673 (2) (402 SE2d 544) (1991). If a creditor fails to give notice of an intended disposition of the collateral or if it conducts a commercially unreasonable sale of the collateral, the evidentiary presumption is raised that the value of that collateral is equal to the remaining indebtedness. *Emmons v. Burkett*, 256 Ga. 855, 857 (2) (353 SE2d 908) (1987). The creditor may rebut this presumption by introducing (1) evidence of the fair and reasonable value of the secured property, and (2) evidence that the value of the collateral was less than the debt. *Business Dev. Corp. of Ga. v. Contestabile*, 261 Ga. 886 (413 SE2d 447) (1992).

(a) One of the mining machines was never repossessed by CCC but was instead sold at auction by the trustee in Benafuels's bankruptcy for $20,000. The proceeds of that sale were retained by the trustee as an asset of the bankruptcy estate and not distributed to CCC. Pursuant to OCGA § 11-9-507 (2), this disposition by the representative of creditors is conclusively deemed to be commercially reasonable, rendering immaterial the failure of CCC to notify Benafuels or Davis of any intent *not* to repossess and dispose of that collateral. Compare *Carlton Mfg. v. Bauer*, 207 Ga. App. 850 (1) (429 SE2d 329) (1993) (order of the bankruptcy court lifting automatic stay and permitting sale of collateral by secured party was not itself a stipulation as to the commercial reasonableness of any sale conducted pursuant to that order). The trial court correctly directed the verdict as to the

commercial reasonableness of that disposition.

(b) As to the remaining two machines, notice of private sale was sent to Benafuels, Inc. Davis did not urge below and does not urge on appeal any issue of a purported failure to notify him personally as a guarantor entitled to the same notice as the debtor, nor does he claim that he did not have actual knowledge of CCC's intentions as stated to Benafuels in those notices. The challenge to the commercial reasonableness of the private sales was sufficiently raised by Davis's amended answer, which claimed that CCC had "not complied with the applicable provisions of Article IX of the Uniform Commercial Code with regard to the collateral." *Bales v. Central Bank & Trust Co.*, 204 Ga. App. 675 (420 SE2d 358) (1992). However, despite rigorous cross-examination of CCC's expert witness as to the value of the collateral, Davis himself did not present any evidence or make any affirmative showing that the method, manner, time, place, or terms (other than possibly price) of the private sales were *not* commercially reasonable.

The unrebutted evidence of CCC showed the following: CCC retained the services of Watters, an experienced dealer in used heavy equipment to view, repossess, haul, clean, repair, store, appraise, and sell the collateral. Although the mining machines were not repossessed from the mine sites immediately upon Benafuels's default, these delays were explained by the need to obtain electric power at one site, by a collision involving the trailer of one miner, and by snowy weather preventing egress from a steeply sloping pit. There is no evidence that these delays resulted in a diminished resale price at private sale or otherwise impaired the reasonable value of the collateral. Watters advertised the machines for sale through a monthly mailing list he had generated during his years in the business of selling used heavy machinery. This list had 350 subscribers among coal mining companies, other equipment dealers, and brokers and salesmen of such used equipment.

Watters gave his opinion of value at the time of repossession and testified how these values were derived. Pertinent factors in determining resale value included the condition of the coal market generally, the age and condition of the equipment upon repossession and after repairs, the suitability of a particular item for a prospective purchaser, and comparable sales. He appraised the smaller of the two machines as having a resale value of $20,000. That amount was eventually received as the cash price at private sale. Watters appraised the other machine at a value of approximately $30,000 to $35,000, upgraded by $10,000 after repairs. This machine sold for $45,000 at private resale, after CCC agreed to finance most of the purchase price. The net proceeds of the sales, after deducting sales commissions and the costs of repairs, hauling, etc., were approximately $16,000 and

$36,000 respectively. There is unrebutted testimony that a willingness on the part of the seller to finance a portion of the purchase price will yield a higher amount than can be obtained through a strictly cash sale. On cross-examination of Mr. Watters, Davis elicited Watters's statement that at the time of repossession, the collateral had no value except as salvage, assuming hypothetically that it could not be resold. This hypothetical would not, however, tend to impeach his direct testimony of value, derived after applying the factors noted above. Vigorous cross-examination was conducted about a stipulated value of the collateral in an agreement entered into during the pendency of Benafuels's bankruptcy, that is, at a time after repossession but before trial. Watters explained that the value stipulated to in that work-out agreement (subsequently defaulted upon by Benafuels) was higher than his opinion of reasonable market value at the time of repossession.

As a broad rule, it is generally for the trier of fact to determine the commercial reasonableness of a private sale under OCGA § 11-9-504 (3). *Ennis v. Atlas Fin. Co.*, 120 Ga. App. 849, 850 (1) (172 SE2d 482) (1969). Nevertheless, this issue of fact may be the appropriate subject for summary judgment or directed verdict. Ultimately, the commercial reasonableness of a sale of repossessed collateral may become a question of law: where the creditor shows prima facie that the sale was reasonable, the debtor must support his challenge by asserting specific facts showing a genuine issue remains for trial. *Slaughter v. Ford Motor Credit Co.*, 164 Ga. App. 428, 429 (296 SE2d 428) (1982). "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." OCGA § 11-9-507 (2).

CCC used an expert dealer to dispose of the collateral in a market for the type of goods at issue. This is a recognized method of disposition. White & Summers, Uniform Commercial Code, § 27-11 (3rd ed. 1988), citing Official Comment 2 to 9-507. There is no claim of fraud, harassment, overreaching, criminal conduct, or self-dealing in the actions taken on behalf of CCC during foreclosure. The uncontradicted evidence demands a finding that CCC came within the safe harbor provisions of OCGA § 11-9-507 (2): "If the secured party [disposes of the collateral] in conformity with reasonable commercial practices among dealers in the type of property sold[,] he *has* sold [it] in a commercially reasonable manner." (Emphasis supplied.) See also *Carter v. First Fed. &c. of Atlanta*, 179 Ga. App. 532, 536 (5) (347 SE2d 264) (1986). The trial court correctly directed the verdict as to the commercial reasonableness of the method, manner, time, place, and terms of these two dispositions, while allowing the jury to deter-

mine the measure of damages based upon its own assessment of the fair and reasonable value of the collateral.

4. Remaining enumerations have been considered and are found to be without merit.

*Judgment affirmed. Blackburn, J., concurs. Johnson, J., concurs in the judgment only.*

DECIDED JULY 16, 1993.

*Lamberth, Bonapfel, Cifelli, Willson & Stokes, Gary D. Stokes, Stuart F. Clayton, Jr.*, for appellant.

*Bisbee, Rickertsen & Herzog, William A. Dupree IV*, for appellee.