A99A2282, A99A2283. PERIMETER REALTY et al. v. GAPI, INC. et al.; and vice versa.

(533 SE2d 136)

PHIPPS, Judge.

Perimeter Realty, JSH Properties, Inc., and Holliday, Fenoglio & Tyler (collectively "the brokers") claim a commission on transfers of real estate by Eugene Anderson, president of GAPI, Inc., then known as Anderson Properties, Inc., and GAPI, Inc. (collectively "Anderson Defendants") of Atlanta, to Highwoods/Forsyth Limited Partnership of North Carolina. The brokers' agents were initially unaware of one another's discussions with Anderson regarding financing or selling Anderson Defendants' real estate. As negotiations proceeded, Anderson Defendants brought the brokers together, and the brokers agreed to share a commission. Anderson Defendants later relieved the brokers from direct participation in the real estate transfer but continued to negotiate their commission. After the transactions were completed, the brokers were paid nothing, and they sued Anderson Defendants and Highwoods under numerous theories of recovery. All parties filed motions for summary judgment.

The trial court denied summary judgment to the brokers as to issues of liability for a commission and for attorney fees, and we affirm. We affirm the trial court's denial of summary judgment to Anderson Defendants on the brokers' claim of quantum meruit. The trial court found that there were fact questions as to issues of fraud and conspiracy and denied summary judgment to Anderson Defendants on those claims. We disagree and reverse. We affirm the trial court's grant of summary judgment to Anderson Defendants on claims of Racketeer Influenced & Corrupt Organizations Act violations and breach of contract. The court further granted summary judgment to Highwoods as to all claims against it, and we affirm.

Case No. A99A2282 is the brokers' appeal. Case No. A99A2283 is Anderson Defendants' cross-appeal.

### JSH Properties, Inc.

On September 7, 1996, Thomas Ross, a real estate agent with JSH Properties, Inc., met Anderson at the home of one of JSH's brokers, William Marett. Ross told Anderson that, through Ross's uncle who worked for Highwoods, he knew that Highwoods was interested in expanding into Atlanta. Ross asked Anderson whether he would

be interested in selling his company. Ross deposed that Anderson responded yes and agreed that if Ross introduced Anderson to Highwoods and Highwoods acquired Anderson Defendants' real estate, Ross would be entitled to a commission.

Three days later, Ross and Marett met Anderson at Anderson's office. During that meeting they discussed issues relating to the exchange of Highwoods's partnership units for Anderson Defendants' real estate, whether Anderson could effectuate a property sale without his partners' approval, and a commission fee arrangement. In his deposition, Ross stated that they concluded that he would represent Anderson Defendants as their real estate agent and that they:

> actually agreed on a commission structure at that meeting, which was one percent of all income-producing properties that were transferred, based on the total value of the income-producing properties; one percent of any value that they put on his business as an entity; and two percent of any raw land that was transferred.

According to Ross, Anderson gave him an information package of Anderson Defendants' real estate, and "Anderson authorized me to represent him to sell every piece of property that was in the package that he gave to me, which was a complete package of every property that he owned and properties that he managed." Ross further deposed:

> Anderson represented himself to be in a position to bind the partners, and he said that he would pay a commission. We went over the fee structure. When I say he, I mean he was there as a partner and he was, you know, discussing a commission agreement, and I drafted the agreement to — to cover him personally and to cover all of any entity related to Gene Anderson or Anderson Properties, Inc. or GAPI, you know. To cover almost every entity that could possibly be related to Gene Anderson that he could bind.

Ross deposed that he reduced the oral agreement to writing, then delivered copies of it to Anderson some time before September 23. Anderson never signed the document.

Ross forwarded Anderson Defendants' information package to Paul Kreckman, one of his contacts at Highwoods. He then set up a meeting for September 25 for Highwoods to meet Anderson.

### *Holliday, Fenoglio & Tyler*

In July 1996, William Tyler, a real estate broker with Holliday,

Fenoglio & Tyler, met with Anderson to discuss procuring equity or debt financing for three development projects. Tyler entered into a written 90-day exclusive agreement, dated July 31, 1996, with Anderson Defendants that provided that he would make presentations to a defined list of potential candidates. Anderson requested that Tyler place Highwoods on that list. The agreement provided, "If the [financing] commitment is obtained by [Holliday, Fenoglio & Tyler] and accepted by [Anderson Defendants], then [Anderson Defendants] agree to pay a commitment fee to us in the amount equal to one and one-half percent [of] the total of project cost minus your equity contribution."

Although Tyler prepared materials regarding the three development projects for potential lenders or investors, he did not prepare anything for Highwoods specific to the three projects. He did, however, prepare "certain information on the Atlanta industrial markets for Highwoods," and between September 5 and September 15, Tyler contacted a Highwoods partner, who was located in Tennessee, to ascertain whether Highwoods had any interest in financing a project in the Atlanta area, without disclosing Anderson Defendants' name. The Tennessee partner referred Tyler to John Turner, naming Turner as the person who would be in charge of any activities in Atlanta.

On September 23, Anderson invited Tyler to a meeting to discuss "what [they had] been working on." At that meeting, Tyler learned that two other brokers were also working on matters between Anderson and Highwoods and that a meeting between Anderson and Highwoods had been scheduled for September 25. Tyler deposed that during the September 23 meeting, his agreement with Anderson was extended. After the September 23 meeting, Tyler spoke with Turner regarding opportunities for engaging in a joint venture with, or providing equity financing to, Anderson Defendants. But it is undisputed that none of the three projects named in the exclusive agreement was developed.

### Perimeter Realty

On August 20, 1996, Thomas Adler, director of Highwoods Properties, Inc. (the general partner of Highwoods/Forsyth Limited Partnership), contacted Sam Scaffide, principal broker of Perimeter Realty, regarding Highwoods becoming a "major player" in the Atlanta market. Two days later, Scaffide telephoned Anderson, and without disclosing Highwoods' identity, told Anderson that a real estate investment trust ("REIT") was interested in purchasing properties in the Atlanta area. Scaffide told Anderson that the REIT would not pay any brokers' commission, and Anderson stated that as the seller, Anderson Defendants would pay the commission. Scaffide

deposed that they agreed to work in "good faith together" but that no property prices were discussed and no amount of commission was determined.

By August 29, Anderson had forwarded to Scaffide an information package concerning Anderson Defendants, and Scaffide forwarded the package to Adler of Highwoods. Adler agreed to forward the material to either Turner or Ron Gibson, both Highwoods executives, and to set up a meeting with Anderson. But around September 16, Adler telephoned Scaffide and told him that Turner and Gibson had contacted Anderson and scheduled an introductory meeting for September 25. At that point, Scaffide revealed to Anderson that Highwoods was the REIT that had expressed an interest in purchasing Atlanta property. Several days later, Anderson invited Scaffide to attend a September 23 meeting, where Scaffide learned that two other brokers were also working on matters between Anderson Defendants and Highwoods.

Recognizing that several brokers might claim a commission in connection with Highwoods's acquisition of Anderson Defendants' real estate and intending to pay only one fee to one broker, Anderson invited Ross, Tyler, and Scaffide to a meeting on September 23, 1996, in anticipation of the September 25 meeting with Highwoods. At that meeting, Anderson introduced the agents to each other, informing them that they each had been working on the same transaction from different angles. Anderson suggested that they confer with each other about their respective roles to avoid a dispute among the brokers that could jeopardize a transaction between Highwoods and Anderson Defendants. The brokers agreed to share a commission equally, and Ross reported to Anderson that their decision was:

> based upon the commission agreement that he had agreed to with Bill Marett and [Ross], and we stated at that time that it was one percent of the total value of income-producing properties, one percent of any value put on his company as an entity, and two percent of any land that was transferred in the transaction.

According to Ross, Anderson responded, "this is great. I'm glad we've been able to work this out, and I'm glad that we can move this transaction forward."

At the end of the meeting, the attendees agreed that Ross would draft a written commission agreement for approval by the parties. Ross revised the draft agreement between Anderson Defendants and JSH, adding the other brokers, adding confidentiality language at Anderson's request, but changing "nothing to the substance of the [initial] agreement." Ross delivered the revised agreement to Ander-

son a few days later. Anderson never signed the document.

On September 25, 1996, Highwoods officers Kreckman and Turner met Anderson, Ross, Tyler, and Scaffide. Ross deposed that during the meeting, Anderson complimented the brokers for agreeing to work together and for not creating a problem for the transaction. Ross deposed that at the meeting:

> One of the things that Mr. Turner said was he thought that we could expedite the process if [Turner] and [Anderson] could communicate directly without having to go through us as brokers. That that would expedite the entire deal process, and none of us voiced any opposition to that at that time.

Ross deposed that Anderson called the brokers to a meeting on October 17, 1996, and told them that it would not be necessary for them to get involved in the details of the transaction, instructing the brokers not to get in the way. Anderson requested that they reduce the commission because of additional fees and penalties associated with the acquisition. The brokers agreed to consider reducing the commission.

During the next several months, Anderson continued to propose a lesser fee, and Scaffide notified Anderson that the brokers had agreed to accept a commission in the amount of $850,000. Two days later, Anderson wrote to Scaffide, "because of the limited requirement of time and effort that I understood would be involved in this transaction, I put a value of one percent (1%) on the equity actually coming to [Anderson Defendants]." Ross deposed that the letter was the first time that Anderson ever mentioned a fee based on a percentage of equity, but Anderson deposed that "[he] in no way wanted to pay them or ever indicated that [he] would pay them on a gross number." The brokers rejected Anderson's proposal.

Meanwhile, Anderson Defendants and Highwoods proceeded with the negotiations without involving the brokers. Although the agents continued to offer their assistance, Anderson requested nothing further from them.

In February 1997, the first transaction closed, and several months later, a second transaction closed. Ross estimated a commission due of nearly $1.2 million based on the alleged September 10 oral agreement between Anderson and JSH, which the brokers claim to have adopted at the September 23 meeting with Anderson. Anderson paid the brokers nothing.

The brokers sued Anderson Defendants under theories of procuring cause and breach of contract. They sued Anderson Defendants and Highwoods under theories of quantum meruit, conspiracy to deprive them of a commission, fraud, and racketeering activities in

violation of OCGA § 16-14-1 et seq. Plaintiffs also sought against Anderson Defendants and Highwoods punitive damages, attorney fees, triple damages under OCGA § 16-14-6, and litigation expenses.

After a period of discovery, the brokers filed a motion for partial summary judgment only as to (1) liability for commission under the alleged commission agreement, and (2) litigation costs and attorney fees. Anderson Defendants and Highwoods each filed motions for summary judgment. Within one week of the hearing on the motions, the brokers amended their complaint, adding claims of promissory estoppel, unjust enrichment, and quantum valebant against Anderson Defendants. The trial court did not reach these issues when ruling on the motions for summary judgment. The amended complaint further added claims based on theories of interference with business relationships and successor in interest against Highwoods.

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[1]

### Case No. A99A2282

1. The brokers contend that the trial court erred in denying their motion for summary judgment as to the issue of liability, maintaining that Anderson Defendants breached its contract for commission and that because of Anderson Defendants' stubborn litigiousness they should have been awarded attorney fees under OCGA § 13-6-11.

(a) Although a written, signed listing agreement for a commission did not exist between the brokers and Anderson Defendants, an oral contract for a commission is enforceable.[2] However, an enforceable contract does not exist unless the parties agree on all material terms.[3] The trial court concluded that a meeting of the minds did not occur between the parties on all terms. Consequently, the court denied the brokers summary judgment on the issue of liability.

The parts of the record cited by the parties do not demonstrate that there was an enforceable oral agreement between the brokers and Anderson Defendants. At a minimum, the agreement lacked essential terms concerning the parties to the contract.[4] The brokers themselves could not agree on the question of whether both Anderson and Anderson Properties were parties to the agreement. Therefore, the trial court correctly denied the brokers summary judgment on

---

[1] OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[2] *Steinemann v. Vaughn & Co.*, 169 Ga. App. 573, 576 (1) (313 SE2d 701) (1984).

[3] *Bagwell-Hughes, Inc. v. McConnell*, 224 Ga. 659, 662 (164 SE2d 229) (1968).

[4] See *Peachtree Med. Bldg. v. Keel*, 107 Ga. App. 438, 441 (130 SE2d 530) (1963).

their breach of a commission contract claim, rendering moot the issue of procuring cause under this claim.[5]

(b) The brokers also argue that the trial court should have granted attorney fees under OCGA § 13-6-11, claiming that there was no basis to dispute liability and that Anderson Defendants were stubbornly litigious. Recovery of attorney fees for stubborn litigiousness is not authorized where there is a bona fide controversy.[6] Because the record shows that bona fide controversies exist,[7] the trial court did not err in denying the brokers summary judgment on their claim of attorney fees.

2. The brokers contend that the trial court erred by striking from consideration nine affidavits they had filed in opposition to Anderson Defendants' motion for summary judgment. OCGA § 9-11-56 (c) requires the trial court to consider opposing affidavits filed at any time prior to the day of the hearing, and it is undisputed that the affidavits were filed before the day of the hearing. Therefore, the trial court abused its discretion in striking the affidavits as untimely. But in view of our holding in Division 4, this error establishes no ground for reversal.[8]

3. The brokers contend that the trial court erred in denying their motion to reconsider striking the affidavits. Our rulings in Divisions 2 and 4 render this enumeration moot.

4. The brokers contend that the trial court erred in granting summary judgment to Anderson Defendants on the RICO claim.

To establish liability for a RICO violation, one must establish a pattern of racketeering activity.[9] A pattern is defined as two or more similar incidents of criminal conduct.[10] The brokers assert that the stricken affidavits contained evidence of the predicate acts of theft by deception,[11] theft of services,[12] and mail or wire fraud.[13] With the nine affidavits stricken from its consideration, the trial court ruled that there was no evidence of a pattern of prohibited conduct. In Division 2, we ruled that the affidavits were incorrectly stricken as untimely.

Nevertheless, four of the brokers' own affidavits did not set forth specific facts that showed other predicate acts. Another affidavit filed by the brokers referenced and relied upon a complaint that did not allege theft by deception, theft of services, or mail or wire fraud. Two

---

[5] *Galloway v. McKinley*, 73 Ga. App. 381, 383-384 (2) (36 SE2d 485) (1945).

[6] *Wheat Enterprises v. Redi-Floors*, 231 Ga. App. 853, 857 (1) (501 SE2d 30) (1998).

[7] See Division 11.

[8] See *Grant v. Crider*, 209 Ga. App. 623 (1) (434 SE2d 161) (1993).

[9] See OCGA § 16-14-4.

[10] OCGA § 16-14-3 (8).

[11] See OCGA § 16-8-3.

[12] See OCGA § 16-8-5.

[13] See *Mullen v. Nezhat*, 223 Ga. App. 278, 281-282 (3) (477 SE2d 417) (1996).

other affidavits were photocopies of affidavits filed in another action in the same court. Assuming that the trial court had taken judicial notice of them,[14] those two affidavits did not set forth specific facts that demonstrated theft by deception, theft of services, or mail or wire fraud. The brokers failed to provide citations to the record for the remaining two affidavits, as required by Court of Appeals Rule 27 (c) (3) (i). "It is not the function of this court to cull the record on behalf of a party in search of instances of error. The burden is upon the party alleging error to show it affirmatively in the record."[15] Accordingly, the brokers have not shown that the affidavits show a pattern of racketeering activity.

Finally, the brokers argue that two predicate acts are shown in this case because there were two closings related to the Highwoods acquisition. We disagree and conclude that the two closings were part of one transaction. A single transaction does not constitute a pattern of racketeering activity.[16]

Thus we affirm summary judgment to Anderson Defendants on the RICO claim.[17]

5. The trial court granted summary judgment to Highwoods "as to all counts." On appeal, the brokers contest only their summarily dismissed claims of conspiracy to deprive them of a commission, tortious interference with business relations, and successor liability.

(a) "A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means."[18] The cause of action for civil conspiracy lies not in the conspiracy itself, but in the underlying tort committed against the plaintiff and the resulting damage.[19] Although there are triable issues on the question of whether a commission was earned,[20] the brokers have presented no evidence supporting their allegation of a conspiracy between Anderson Defendants and Highwoods. All the brokers have shown is that Highwoods negotiated directly with Anderson after the brokers were informed that their presence was not necessary. This does not establish a conspiracy. The trial court

---

[14] *Petkas v. Grizzard*, 252 Ga. 104, 108-109 (312 SE2d 107) (1984) (a trial court may take judicial notice of records on file in the same court, but the court is not required to do so).

[15] (Citation omitted.) *Bergmann v. McCullough*, 218 Ga. App. 353, 355-356 (3) (461 SE2d 544) (1995).

[16] See OCGA § 16-14-3 (8); *Raines v. State*, 219 Ga. App. 893-894 (1) (467 SE2d 217) (1996); compare *Dover v. State*, 192 Ga. App. 429, 431-432 (1) (385 SE2d 417) (1989).

[17] *Stephens v. State Farm &c. Ins. Co.*, 236 Ga. App. 758, 759 (1) (513 SE2d 508) (1999).

[18] (Citations and punctuation omitted.) *U. S. Anchor Mfg. v. Rule Indus.*, 264 Ga. 295, 297 (1) (443 SE2d 833) (1994).

[19] *Cook v. Robinson*, 216 Ga. 328-329 (1) (116 SE2d 742) (1960).

[20] See Division 11. To establish that a conspiracy existed to deprive the brokers of a commission, the brokers must first show that the commission was earned. *Hodges-Ward Assoc. v. Ecclestone*, 156 Ga. App. 59, 61 (1) (273 SE2d 872) (1980).

did not err in its ruling on the conspiracy issue.

(b) To establish a cause of action for tortious interference with business relations, one must demonstrate that the defendant (i) acted improperly and without privilege, (ii) purposely and with malice with the intent to injure, (iii) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (iv) for which the plaintiff suffered some financial injury.[21] The trial court properly granted Highwoods's motion for summary judgment on this issue because there is no evidence of improper acts, intended to induce Anderson Defendants to discontinue its business relationship with the brokers.

(c) The brokers contend that the trial court erred in granting Highwoods summary judgment on their claim of successor liability. It is undisputed that Highwoods paid for the real estate with partnership units of its own company. The record also contains evidence that Highwoods assumed certain of Anderson Properties' liabilities and obligations. As part of the acquisition, Highwoods purchased the name "Anderson Properties," acquiring between 60 and 90 percent of the total holdings of that company. Concurrent with the acquisition, Anderson renamed Anderson Properties to GAPI, Inc., which now owns the three properties that were not acquired by Highwoods.

Anderson deposed that in his current position as senior vice president and a director of Highwoods, he is in charge of the Atlanta operations. He stated that his duties at Highwoods are substantially the same as were his duties as president for Anderson Properties. He stated that "90 plus" percent of the Anderson Properties staff now works at Highwoods and that their duties have also remained substantially the same.

Generally a purchasing corporation does not assume the liabilities of the seller unless: (i) there is an express agreement to assume the liabilities; (ii) the transaction is a fraudulent attempt to avoid liability; (iii) the purchaser is a mere continuation of the predecessor corporation; or (iv) the transaction is, in fact, a merger,[22] as between the purchasing corporation and the selling company. The rules on successor liability have been applied to intercorporate sales transactions. In *Pet Care Professional Center v. BellSouth Advertising &c. Corp.*,[23] this court held that this law applies where a corporation acquired a partnership. The trial court and the parties have applied this law in this case, and it is the law that we will apply here.

The brokers point to no evidence of an express agreement

[21] *Life Care Ambulance v. Hosp. Auth. of Gwinnett County*, 202 Ga. App. 864, 868 (415 SE2d 502) (1992).

[22] *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (328 SE2d 726) (1985).

[23] 219 Ga. App. 117, 118-119 (464 SE2d 249) (1995).

wherein Highwoods agreed to assume the obligation to pay a commission, and the acquisition, which allegedly triggered a commission, could not have been a fraudulent attempt to avoid paying it. The common law continuation theory has been applied in Georgia where "there is a substantial identity of ownership and a complete identity of the objects, assets, shareholders, and directors" as between the purchasing corporation and the selling company.[24] Here there is not a complete identity of assets.

A de facto merger occurs when one company is absorbed into another.[25] To find a de facto merger, four elements must be present:

> (1) There is continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations. (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation. (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.[26]

The record does not demonstrate that Anderson Properties has liquidated and dissolved. The company has been renamed "GAPI, Inc.," and continues to operate and own properties. The brokers have not demonstrated that a de facto merger occurred between Anderson Properties and Highwoods.

The trial court did not err in concluding that the doctrine of successor liability does not apply to the facts of this case.

6. The brokers complain that the trial court erred in denying their motion to extend discovery. The record shows that the trial court granted the first motion to extend discovery, extending discovery to May 28, 1998. The trial court granted a second extension, requested by all the parties, extending discovery through July 31, 1998. The trial court granted a third extension through August 31, 1998. In a motion filed November 12, 1998, the brokers moved the

---

[24] (Citation omitted.) *Davis v. Concord Commercial Corp.*, 209 Ga. App. 595, 597 (1) (434 SE2d 571) (1993).

[25] See *Howard v. APAC-Ga.*, 192 Ga. App. 49, 50 (383 SE2d 617) (1989).

[26] (Citations omitted.) Id. at 50-51.

court to extend the discovery period for 60 additional days. In its summary judgment order, the trial court denied the brokers' motion to extend, noting that it had "already granted [extensions] of the discovery period and a substantial amount of discovery ha[d] been provided by the respective parties." A trial court has wide discretion to shorten, extend, or reopen the time for discovery, and its decision will not be reversed unless a clear abuse of that discretion is shown.[27] We conclude that the brokers have not shown a clear abuse of discretion.

7. The order which extended discovery through August 31, 1998, related to the taking of certain depositions and discovery of facts or issues raised by those depositions, if the need for such discovery could not have been reasonably foreseen prior to the depositions. In their brief, the brokers assert that on August 31, they served Anderson Defendants with " 'follow-up' discovery, as to issues raised in the depositions." Anderson Defendants did not respond to the requests. The record shows that on November 12, the brokers moved to compel Anderson Defendants to answer the discovery requests. In its order on summary judgment, the trial court denied the motion, and the brokers contend that the trial court erred in doing so. "The trial court's discretion in dealing with discovery matters is very broad, and this court . . . will not interfere with the exercise of that discretion absent a clear abuse."[28]

Uniform Superior Court Rule 5 provides, for a party to utilize the court's compulsory process to compel discovery, any desired discovery procedures must first be "commenced promptly, pursued diligently and completed without unnecessary delay." That rule also states that the court has discretion to shorten the time for a party to utilize the court's compulsory process to compel discovery. The brokers have not shown that the need for such discovery could not have been reasonably foreseen before the depositions, and they do not otherwise explain the delay. Moreover, the brokers' unexplained delay in filing their motion to compel shows a lack of promptness and diligence. We cannot say that the trial court clearly abused its discretion in denying their motion to compel.

8. The brokers filed their complaint on July 18, 1997, and on November 2, 1998, they moved the trial court to transfer the case, asserting that another judge of the superior court was also hearing two cases against Anderson Defendants that "involve[d] many of the same factual issues, i.e., breach of contract, fraud and breach of fiduciary duty." "When practical, all actions involving substantially the same parties, or substantially the same subject matter, or substan-

[27] *Woelper v. Piedmont Cotton Mills*, 266 Ga. 472, 473 (1) (467 SE2d 517) (1996).
[28] (Citations and punctuation omitted.) *Ostroff v. Coyner*, 187 Ga. App. 109, 117-118 (6) (369 SE2d 298) (1988).

tially the same factual issues, whether pending simultaneously or not, shall be assigned to the same judge."[29] Here, only Anderson Defendants are parties in all the cases, and the record does not demonstrate that the factual issues are substantially the same. In addition, it is not practical to transfer a case which has progressed through discovery to the point where a hearing on cross-motions for summary judgment is being conducted.[30] A trial judge has broad discretion in matters concerning the regulation and control of the business of the court,[31] and we find no abuse of that discretion in the trial court's denial of the brokers' motion to transfer.

## Case No. A99A2283

9. Anderson Defendants contend that the trial court erred in denying them summary judgment on the brokers' claim of conspiracy to deprive them of a commission. We held in Division 5 (a) that summary judgment for Highwoods on this issue was correct because the brokers presented no evidence of a conspiracy between Anderson Defendants and Highwoods. Under these circumstances, it follows that summary judgment for Anderson Defendants on this claim is also appropriate.[32] The trial court erred in denying it.

10. Anderson Defendants contend that the trial court erred in denying them summary judgment on the claim of fraud. The tort of fraud has five elements: (1) a false representation by a defendant, (2) scienter (knowing that the representation was false at the time made), (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff.[33] The record demonstrates that Anderson told the brokers that they would be paid a commission if they procured a buyer, that the brokers contacted Highwoods in contemplation of a sale of Anderson Defendants' real estate to Highwoods, that Highwoods purchased certain real estate owned by Anderson Defendants, and that the brokers were paid no compensation in connection with the acquisition.

> Normally, fraud cannot be predicated on statements which are in the nature of promises as to future events. The well recognized exceptions to this rule are promises made without present intent to perform, which is a misrepresentation

[29] USCR 3.2.

[30] See *Big Brother/Big Sister of Metro Atlanta v. Terrell*, 183 Ga. App. 496, 498 (2) (359 SE2d 241) (1987).

[31] Id.

[32] *U. S. Anchor*, supra, 264 Ga. at 297 (1) (a conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means).

[33] *Baldwin v. Roberts*, 212 Ga. App. 546, 547 (2) (442 SE2d 272) (1994).

of a present state of mind, and promises made as an inducement to enter a contract. Both of these exceptions to the general rule require the promise (or concealment) be made in a manner as to deceive and mislead.[34]

Scienter is seldom susceptible of direct proof, and recourse to circumstantial evidence usually is required. But there must be some evidence from which a jury could find that a misrepresentation was known to be false at the time made or that it was recklessly made with the intent of deceiving the opposite party.[35] The brokers have failed to point to evidence from which a jury could find fraud. Therefore, the trial court erred in denying summary judgment to Anderson Defendants on this claim.

11. Anderson Defendants contend that the trial court erred in denying their motion for summary judgment against the brokers on claims of quantum meruit and procuring cause because the brokers played no part, or only a negligible part, in initiating or facilitating the Highwoods acquisition.

To recover under a quantum meruit theory, the brokers had to show:

(1) [their] performance as agent of services valuable to the defendants; (2) either at the request of the defendants or knowingly accepted by the defendants; (3) the defendants' receipt of which without compensating [them] would be unjust; (4) [their] expectation of compensation at the time of the rendition of the services; (5) and that [they were] the procuring cause of the completed transaction. [Cits.][36]

Although a broker does not establish he was the procuring cause by merely showing he first located the ultimate buyer, a broker can make out a case if he can show interference by the owner and no abandonment of his efforts to effectuate the sale.[37]

When the agent contends that he was the procuring cause, . . . he does make out a prima facie case when he shows that negotiations for the sale were set on foot through his efforts, that he performed every service required by his employment which it was possible to perform, and that the failure on his

---

[34] (Citations and punctuation omitted.) *Community Fed. Sav. &c. Assn. v. Foster Developers*, 179 Ga. App. 861, 864 (1) (348 SE2d 326) (1986).

[35] Id.

[36] *Allen v. T. A. Communications*, 181 Ga. App. 726, 727 (353 SE2d 569) (1987).

[37] *Crawley v. Sexton*, 207 Ga. App. 360, 364 (1) (427 SE2d 804) (1993).

part to personally consummate the trade was due to the interference of the defendant.[38]

Consequently, the broker may be the procuring cause of the sale even though the buyer and seller decide to negotiate the sale without the presence of the broker after the broker brings the principals together. The record supports the brokers' claim that they introduced Anderson to Highwoods and that as a result of this introduction, Anderson Defendants sold real estate to Highwoods. Their efforts in this case also included presenting the information package to Highwoods and setting up the introductory meeting. Although the brokers continued to attempt to monitor the real estate negotiations and to offer assistance, Anderson told them that there was nothing for them to do. Therefore, the trial court correctly denied summary judgment to Anderson Defendants on these issues, and a jury should decide whether the brokers are entitled to a recovery in quantum meruit.[39]

12. Anderson Defendants contend that the trial court erred in not granting their motion for summary judgment on the brokers' claims for attorney fees and punitive damages. But "[q]uestions of bad faith, stubborn litigiousness, and unnecessary expense, under OCGA § 13-6-11, are generally questions for the factfinder."[40] The trial court did not err as to attorney fees.

Regarding punitive damages, the trial court did not rule on that issue. This court is for the correction of errors, and where the trial court has not ruled on an issue, we will not address it.[41]

*Judgment affirmed in Case No. A99A2282. Judgment affirmed in part and reversed in part in Case No. A99A2283. Johnson, C. J., and McMurray, P. J., concur.*

## ON MOTION FOR RECONSIDERATION.

Perimeter Realty, JSH Properties, Inc., and Holliday, Fenoglio & Tyler, hereinafter referred to as "appellants," have filed a motion for reconsideration. In support of various arguments asserted in the motion, appellants contemporaneously filed a motion to supplement the record with the affidavit of Knute Guenther.

Appellants filed their brief in August 1999, noting that several documents, apparently including the affidavit of Guenther, were missing and would be included by supplemental record. The record

---

[38] *Tomlin v. Bickerstaff*, 85 Ga. App. 48, 51-52 (2) (68 SE2d 224) (1951).

[39] See generally *Sharp-Boylston Co. v. Lundeen*, 145 Ga. App. 672, 674 (244 SE2d 622) (1978).

[40] *Manderson & Assoc. v. Gore*, 193 Ga. App. 723, 735 (9) (389 SE2d 251) (1989).

[41] *Pyle v. City of Cedartown*, 240 Ga. App. 445 (524 SE2d 7) (1999).

was not supplemented, and on March 30, 2000, we decided the case without considering the affidavit. On April 10, 2000, appellants filed their motion to supplement the record with the affidavit of Guenther, informing this Court for the first time that although it was missing from the appellate record, the affidavit "appears in the trial court records at R-4051 through R-4055."

As this court stated in *Williams v. Food Lion*, 213 Ga. App. 865, 868 (446 SE2d 221) (1994):

> It is the primary responsibility of the appropriate parties and not this court to ensure that all documents relevant to the disposition of an appeal be duly filed with the clerk of this court prior to the issuance of our appellate decision. This appellant did not do. Appellant cannot now perfect a deficiency in his appeal by the belated filing of records, which were missing through no fault of this court at the time of our appellate disposition of this case. As a general appellate rule adopted as necessary to protect or effectuate our appellate judgments (Art. VI, Sec. I, Par. IV, Ga. Const. of 1983), we hold that it is the state of an appellate record and transcript duly before us at the time of our original disposition of the appeal, and not the state of the record as amended in an attempt to support an appellate position argued on motion for reconsideration, that is controlling as to the adequacy of the record for purposes of appellate review.

*Motion to supplement record and motion for reconsideration denied.*

DECIDED MARCH 30, 2000 —
RECONSIDERATION DENIED APRIL 14, 2000 — 

*Stanley E. Kreimer, Jr.*, for appellants.
*Bondurant, Mixson & Elmore, M. Jerome Elmore, Lynn M. Adam, David G. Brackett, Holt, Ney, Zatcoff & Wasserman, Joseph S. Jacobson, Jay F. Castle*, for appellees.

