**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**GOBEIL and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 22, 2022**

# In the Court of Appeals of Georgia

A22A0127.  POP  3  RAVINIA,  LLC  v.  EMBARK  HOLDCO MANAGEMENT, LLC

PINSON, Judge.

POP 3 Ravinia, LLC sued Embark Holdco Management, LLC, among others, to recover unpaid rent and other expenses under a commercial lease. Embark was not a party to the lease, but Ravinia claimed that Embark was liable as a successor to the tenant, either because Embark was a "mere continuation" of the now-defunct tenant or because Embark and the tenant had effectuated a "de facto merger." The trial court granted Embark's motion for summary judgment, concluding that equitable considerations cut against imposing liability under the continuation doctrine and that the elements of a de facto merger were not satisfied.

We affirm in part and reverse in part. We agree with the trial court that the evidence, even viewed favorably to Ravinia, does not establish all the elements of a de facto merger. But that evidence would allow a jury to conclude that Embark is a "mere continuation" of Access Holdco under the established elements of the corporate continuation doctrine. As we will explain below, we are skeptical that equitable considerations beyond those elements are properly considered under Georgia's version of that doctrine. But even if this equitable doctrine has some flexibility, we do not think that the additional factors Embark and the trial court injected into the analysis apply in Embark's favor here.

Background

(a) The Lease

In 2010, Access Insurance Holdings, Inc., as tenant, entered into an agreement with CRT Ravinia, LLC, as landlord, to lease about 77,000 square feet of space in an Atlanta office building known as Three Ravinia Drive.[1] The lease was to run for 10 years, until December 2020. In 2016, CRT Ravinia assigned its interest in the lease

_____

[1] In reviewing summary judgment orders, we view the evidence in the record in the light most favorable to the party opposing summary judgment. *Patterson v. Kevon, LLC*, 304 Ga. 232, 236 (818 SE2d 575) (2018). Here, Ravinia opposed summary judgment so we construe the facts in the light most favorable to it.

to Appellant POP 3 Ravinia, LLC. Also in 2016, Access Insurance Holdings assigned its interest in the lease to an affiliated company, Access Holdco Management, LLC.

(b) Access Holdco's Financial Troubles

Access Holdco's business was administering policies and claims for insurance carriers—it was what's called a managing general agent. Access Holdco did this work for "nonstandard" auto insurance carriers: carriers who offer insurance to insureds who, because of a lack of driving history or a poor driving record, are unable to qualify for standard auto insurance. Most of the policies Access Holdco serviced were issued by a single affiliated insurance carrier, Access Insurance Company.

In March 2018, following investigations by insurance regulators in California and Texas, Access Insurance Company was placed into a receivership and enjoined from selling insurance. Having suddenly lost its primary source of revenue, Access Holdco defaulted on $55 million in secured debt, and the creditor began exercising its default remedies.

Faced with possible liquidation, Access Holdco's majority owner, private equity firm Altamont Capital Partners LLC, set about to salvage its investment in the company. According to an Altamont executive, Altamont believed "that there was

3

asset value [in Access Holdco] that . . . we could harvest if we bought the debt at a price that made sense." So in May 2018, an Altamont subsidiary called ACP Insurance Finance, Inc. purchased Access Holdco's debt from the creditor.

In the months that followed, Altamont marketed the company to third-party buyers. During that time, Access Holdco laid off more than 200 employees. In the meantime, ACP Insurance Finance—again, a subsidiary of Altamont, which also owned Access Holdco—demanded more than $21 million in debt payments, which Access Holdco paid.

(c) Access Holdco's Assets Are Transferred to Embark

In August 2018, Access Holdco formally converted from a Georgia LLC to a Delaware LLC. Nine days later, on August 23, 2018, Access Holdco initiated a proceeding known as an assignment for the benefit of creditors ("ABC") in the Delaware Chancery Court. An ABC is an alternative to bankruptcy, sanctioned under the laws of some states, in which the debtor voluntarily transfers its assets to a fiduciary assignee, who is responsible for selling the assets and distributing the proceeds to creditors. See 9 NORTON BANKR. L. & PRAC. 3D §§ 171:1-171:2 (Apr. 2022); see also Jonathan P. Friedland, STRAT. ALT. DIS. BUS. § 10:1 (Jan. 2022) ("an

4

ABC is the state law equivalent to liquidation under chapter 7 of the Bankruptcy Code").[2] To start the process, Access Holdco assigned its assets to certain fiduciary entities ("ABC Entities"), which in turn filed an ABC petition in the Chancery Court.

On the same day the ABC petition was filed, the ABC Entities transferred Access Holdco's assets to a newly-formed company called Embark Holdco Management, LLC. Embark was wholly owned, albeit indirectly, by Altamont.[3] Under the agreement, Embark bought all of Access Holdco's assets *except* its interest in the lease for Three Ravinia Drive. As consideration, ACP Insurance Finance agreed to discharge $27 million of Access Holdco's secured debt and to assume certain liabilities. The net result was the transfer of Access Holdco's assets, free of any secured debt, to Embark.[4] Access Holdco was subsequently dissolved. As described by Access Holdco's former operations and facilities director, the purpose

_____

[2] Such proceedings have apparently become "commonplace" in Delaware as a more cost-effective alternative to bankruptcy proceedings. Friedland, at § 23:4. See Del. Code Ann. tit. 10, §§ 7381 to 7387.

[3] The corporate chain connecting Embark to Altamont runs through four other corporate entities, including ACP Insurance Finance, each a wholly-owned subsidiary of the other.

[4] Two independent appraisals valued the company's assets at approximately $13.4 million and $15 million, respectively. Thus, using either appraisal, the value of the assets was significantly less than the value of the discharged debt.

of the transfer of assets to Embark was "to continue the Access [Holdco] business without paying certain . . . vendors, including [Ravinia]."

(d) The Insurance Administration Business Continues

Amidst these machinations, the insurance administration business continued. In the days after August 23, 2018, Embark was conducting the same business, using the same assets and employing the same personnel, as Access Holdco had before the asset transfer. Employees continued using the same company-issued computers and email accounts, and their accumulated leave and seniority were carried over from Access Holdco to Embark. The company used the same computer server, which contained all of Access Holdco's historical documents. For several weeks after August 23, Embark continued occupying the office space at Three Ravinia Drive, until it moved into new space in October 2018. The management team at Embark was "exactly the same" as the former management team at Access Holdco. And even before the sale, Access Holdco's accounting team had been instructed to ask vendors to begin directing invoices to Embark and to "get new contracts under the Embark name."

(e) Proceedings Below

6

Embark vacated the office space at Three Ravinia Drive in October 2018. Ravinia demanded rent for September 2018 from Access Holdco, and Access Holdco refused, so Ravinia filed suit against Access Holdco and Embark, seeking damages of over $5 million in rent and other expenses recoverable under the lease.[5] Following discovery, Embark moved for summary judgment, contending that it could not be held liable under the lease because it neither signed the lease nor assumed any obligations thereunder. In response, Ravinia argued that Embark should be held liable as a successor to Access Holdco, citing principles of common law corporate successor liability. Ravinia contended that Embark remains liable either because (1) Embark is a "mere continuation" of Access Holdco or (2) the asset purchase constituted a "de facto merger" between the two companies.

The trial court granted Embark's motion. Adopting an order prepared by Embark's counsel, the court held that the elements of a "de facto merger" were not satisfied, and it declined to impose liability on Embark as a "mere continuation" of Access Holdco based on certain equitable considerations. In declining to apply the

---

[5] Access Holdco's predecessor on the lease, Access Insurance Holdings, was also named as a defendant, but it was later dismissed from the suit after reaching a settlement with Ravinia. Ravinia also dismissed its claims against Access Holdco after the latter's dissolution. Embark is thus now the sole defendant in the case.

7

continuation doctrine, the court relied heavily on *Acme Sec., Inc. v. CLN Props., LLC (In re Acme Sec., Inc.)*, a federal bankruptcy case in which the federal bankruptcy court declined to impose successor liability, even though the elements of the continuation doctrine were established under Georgia law, concluding that it would not serve the interests of equity under the circumstances. 484 B.R. 475 (Bankr. N.D. Ga. 2012). Without a basis for imposing successor liability, the court concluded, Embark, a non-party to the lease, could not be held liable under it. Ravinia appealed.

## Discussion

On appeal, orders granting or denying summary judgment are reviewed de novo. *Johnson v. Omondi*, 294 Ga. 74, 76 (751 SE2d 288) (2013). Summary judgment is appropriate where no genuine issues of material fact remain and the party seeking summary judgment is entitled to judgment as a matter of law. Id. at 75.

Ravinia's basic claim here is that Embark is liable for rent and other expenses owed to Ravinia by Access Holdco. The underlying legal theory is one of successor liability: that the transfer of assets from Access Holdco to Embark and the circumstances surrounding that transfer made Embark a "successor" to Access Holdco that is liable for its debts. See *Davis v. Concord Comm'l Corp.*, 209 Ga. App.

8

595, 596 (1) (434 SE2d 571) (1993) ("The term 'successor' means . . . another corporation which by a process of amalgamation, consolidation, or duly authorized legal succession has become invested with the rights and has assumed the burdens of the first corporation.").

Generally speaking, a corporation does not become a successor when it buys another corporation's assets. See, e.g., *Carswell v. Nat'l Exchange Bank*, 165 Ga. 351 (4) (140 SE 755) (1927). But our Supreme Court has listed four common-law exceptions to this general rule, see *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (328 SE2d 726) (1985), which "[m]ost jurisdictions recognize," *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1456 (IV) (11th Cir. 1985). Under these exceptions, a purchasing corporation is a successor liable for the seller's debts if "(1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation." *Bullington*, 254 Ga. at 284. Accord *Wilson v. Wernowsky*, 355 Ga. App. 834, 845 (3) (846 SE2d 101) (2020).

The second and fourth of these exceptions are at issue here. Ravinia contends that Embark is a successor either as a "mere continuation" of Access Holdco or because the asset transfer amounted to a "de facto merger" between the two

9

companies. The trial court rejected both grounds for successor liability as a matter of law and so granted summary judgment to Embark. We review each conclusion in turn.

1. The common law continuation doctrine is essentially what it sounds like: the new corporation assumes the liabilities of the old corporation when the new corporation, with the same or similar owners, continues the old corporation's business. *Johnson-Battle Lumber Co. v. Emanuel Lumber Co.*, 33 Ga. App. 517, 517 (126 SE 861) (1925) (explaining that a new corporation that is "incorporated for the same objects and purposes" and "takes over the entire assets and business of the old corporation" and has the same stockholders, among other similarities, is "but a continuance of the old corporation" and thus is "liable for [its] debts"). We have said that the doctrine applies when the old and new corporations share both (a) "a substantial identity of ownership" and (b) "a complete identity of the objects, assets, shareholders, and directors." *Dan J. Sheehan Co. v. Fairlawn on Jones Condo. Ass'n, Inc.*, 334 Ga. App. 595, 597 (1) (780 SE2d 35) (2015) (cleaned up); accord *Wilson*, 355 Ga. App. at 845 (3).

(a) A "substantial identity of ownership" does not require complete identity and may involve merely "some" identity of ownership. *Bullington*, 254 Ga. at 284. We

10

have thus found a substantial identity of ownership where the new corporation succeeded to the assets of a partnership, even though only three of the four partners were stockholders in the new corporation. *Pet Care Professional Ctr., Inc. v. BellSouth Advertising & Publ'g Corp.*, 219 Ga. App. 117, 118 (1) (464 SE2d 249) (1995). Similarly, we have held that this element was satisfied where the new entity, an LLC, was formed by one of two members in the old LLC. *Wilson*, 355 Ga. App. at 845-46 (3).

Here, the evidence viewed in the light most favorable to Ravinia shows a substantial identity of ownership as between Access Holdco and Embark. Embark admits that its ultimate parent company, Altamont, indirectly owned a substantial majority share—more than two-thirds—of the former Access Holdco. And Embark admits that Altamont now owns, indirectly, 100% of Embark. The same person or entity having a substantial controlling interest in both the old and new entities counts as a substantial identity of ownership for purposes of the continuation doctrine. See *Wilson*, 355 Ga. App. at 845-46 (3); *Pet Care*, 219 Ga. App. at 118 (1).

(b) The identity-of-assets-and-objects element gets at whether the new company is running a business that just looks something like the old company's business (not enough), as opposed to continuing to run the old's company business.

11

See *Dan J. Sheehan Co.*, 334 Ga. App. at 597 (1) (continuation doctrine applied where "[f]or practical purposes, nothing changed except the name of the [corporation]"). To assess this element, we have compared things like the old and new entities' operations, assets, employees, management, location, vendors, and clients. See *Wilson*, 355 Ga. App. at 845-46 (3) (new company was properly held liable for old company's obligations where new company provided the same services, used the same brokers, employed the same personnel, had the same assets, and serviced the same clients as old company); *Dan J. Sheehan Co.*, 334 Ga. App. at 597-98 (1) (new homeowners' association should have been held liable as a matter of law for liabilities of old HOA where the new HOA had, among other things, the same purpose, subject property, board of directors, officers, voting members, unit owners, and physical location as the old HOA); *Pet Care*, 219 Ga. App. at 118 (1) (new corporation was properly held liable for old company's obligations where it was incorporated to operate the same type of business from the same location and used the same assets and vendors). Cf. *Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 592-93 (5) (c) (533 SE2d 136) (2000) (purchasing corporation did not share a "complete identity of assets" with seller where it acquired the seller's name but just 60-90% of the its real estate holdings).

12

The evidence here, viewed in the light most favorable to Ravinia, shows that the asset transfer resulted in a seamless continuation of Access Holdco's business, unencumbered by certain liabilities, including those under the Three Ravinia lease. As of August 23, 2018, Embark was conducting the same business—administering insurance policies and claims—and using the same assets, including computers, historical records, and email accounts, as Access Holdco had until then. Embark's management team was "exactly the same" as Access Holdco's, and it continued employing the same personnel, who carried over their leave and seniority from the old company. Embark continued its relationships with many of Access Holdco's vendors, taking steps before the asset transfer to accomplish this.

Embark points out one difference between Access Holdco and Embark: Access Holdco's largest former client—the defunct Access Insurance Company—is not a client of Embark. But this difference does not preclude a finding of identity of corporate assets and objects, at least not as a matter of law. For one thing, this is not so clearly a difference between the two companies at all. Access Insurance collapsed several months before the transfer of assets from Access Holdco to Embark, so at the time of the transfer, Access Insurance was not a client of Access Holdco, either. In other words, Embark's book of business was the same as Access Holdco's book of

13

business at the time of the transfer, which supports viewing Embark as a continuation. And in any event, this is but one potential difference among a number of key similarities. Given the substantial carryover from Access Holdco to Embark—of business model, assets, management, personnel, vendor relationships, and more—we can't say that Embark replacing Access Holdco's "captive" client with other clients over time precludes a finding of identity of assets and objects as a matter of law.

(c) The trial court rejected Ravinia's mere-continuation argument for successor liability as a matter of law, but its analysis made only a passing reference, in a footnote, to the two required elements of the doctrine. Instead, in an order prepared by Embark's counsel and following the lead of a single federal bankruptcy decision, the court introduced "other factors" to the mere-continuation analysis and concluded that they foreclosed that theory of liability as a matter of law.[6]

This alternative approach to the continuation doctrine does not work here. To begin with, we are skeptical that the continuation doctrine as it has developed in Georgia allows courts to consider factors beyond the two core elements of the doctrine, which already mark a narrow path to successor liability. In adopting this

---

[6] The wholesale adoption of orders prepared by counsel is "greatly disfavored." *Hughes v. Cornerstone Inspection Group, Inc.*, 336 Ga. App. 283, 284 (1) (784 SE2d 116) (2016).

other-factors approach, the trial court relied on *In re Acme*, 484 B.R. 475, which reasoned that meeting the elements of the continuation doctrine "do[es] not end the inquiry" if "other factors establish[] that the successor liability doctrine should not apply based on equitable principles and the fundamental purposes of the doctrine." Id. at 488. But federal bankruptcy court decisions are not binding on Georgia courts, see *Nissan North America, Inc. v. Walker-Jones Nissan, LLC*, 345 Ga. App. 447, 455 (1) (812 SE2d 130) (2018), and *In re Acme* cited no Georgia cases for its novel approach. Nor could it: Every Georgia case applying this doctrine that we can find has focused only on identity of ownership, assets, and objects. See, e.g., *Wilson*, 355 Ga. App. at 845-46 (3); *Dan J. Sheehan Co.*, 334 Ga. App. at 597-98 (1); *First Support Svcs., Inc. v. Trevino*, 288 Ga. App. 850, 853-54 (655 SE2d 627) (2007)*; Perimeter Realty*, 243 Ga. App. at 593 (5) (c); *Pet Care*, 219 Ga. App. at 118 (1); *Ney-Copeland & Assocs., Inc. v. Tag Poly Bags, Inc.*, 154 Ga. App. 256, 256 (267 SE2d 862) (1980); *Johnson-Battle Lumber Co.*, 33 Ga. App. at 517. See also *In re Acme*, 484 B.R. at 491 (noting that "[n]one of the Georgia cases state any requirements for imposition of successor liability based on the mere continuation theory beyond the essential elements of identity of ownership, assets, and objects"). And both of our Supreme Court's cases addressing this doctrine declined efforts to

modify that basic test. See *Farmex Inc. v. Wainwright*, 269 Ga. 548, 549-50 (501 SE2d 802) (1998) (declining to expand the application of the continuation doctrine in products-liability cases); *Bullington*, 254 Ga. at 284 (same).

But even if the continuation doctrine has some play in the joints beyond the two "identity" elements (it is, after all, a creature of equity, see *Wilson*, 355 Ga. App. at 845 (3)), we are not persuaded that the factors Embark relies on make sense as part of that inquiry here.

First, citing OCGA § 11-9-627 (c) (4), Embark points out that the "disposition" of Access Holdco's assets was "commercially reasonable" because it was "approved" in the Delaware ABC process by the assignee for the benefit of creditors. But even assuming this is correct, it's hard to see how that conclusion is relevant to the continuation question here. "Commercially reasonable" status under this provision just means that a secured party complied with its obligation under the UCC to collect or enforce debts, and dispose of or accept collateral, in a commercially reasonable manner. See OCGA §§ 11-9-607 (c); 11-9-610 (b); 11-9-622 (a). Not even the *In re Acme* court was willing to treat that status alone as a "safe harbor that prevents imposition of successor liability." *In re Acme*, 484 B.R. at 489-90. Indeed, that court noted the general agreement among other jurisdictions "that an intervening exercise

16

of a secured creditor's rights with regard to its collateral does not provide an automatic exemption from the imposition of successor liability." Id. (citing *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 267 (1st Cir. 1997) (applying Rhode Island law) (collecting cases); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 273-75 (D.N.J.1994) (applying New Jersey law) (collecting cases). Count us in too: Nothing in these UCC provisions grants a creditor and debtor the power to, in effect, discharge underlying third-party debts (in the ABC process or otherwise) outside of bankruptcy. We decline to effectively grant that novel power by weaving it into an equitable doctrine that exists largely to prevent just that kind of conduct. See *Ed Peters Jewelry Co.*, 124 F.3d at 267 n.15 ("Unlike a bankruptcy court, however, a secured creditor and its nonbankrupt debtor lack the power—either at common law or by statute—to effect a discharge of underlying third-party debts, even for the most beneficent of reasons.").

Second, Embark asserts that Access Holdco was insolvent when it went through the ABC process. Embark says this shows that the asset transfer (and shedding of its liability to Ravinia) did not prejudice Ravinia because, as an unsecured creditor, it would have been left with nothing had Access Holdco been liquidated. Other jurisdictions have rejected this argument, either expressly or

17

implicitly, as a basis for denying successor liability. See *Ed Peters Jewelry Co.*, 124 F.3d at 266-68 & n.15 (rejecting old corporation's insolvency as a basis for denying successor liability); see also *Gladstone v. Stuart Cinemas, Inc.*, 878 A.2d 214, 223 (Vt. 2005) (reversing summary judgment, permitting continuation-doctrine claim to proceed even where first corporation was insolvent); *Cont'l Ins. Co. v. Schneider, Inc.*, 810 A.2d 127, 133 (Pa. Super. Ct. 2002) (permitting unsecured creditor's claim based on successor liability following foreclosure by secured creditor of insolvent predecessor), aff'd, 873 A2d 1286 (Pa. 2005). We don't find it persuasive either, at least under the circumstances here. The notion that taking away an otherwise valid breach-of-contract claim would cause Ravinia zero prejudice is based on an alternate history where Access Holdco liquidated its business and Ravinia was left out in the bankruptcy. Maybe that all would have happened. But if Ravinia has a breach-of-contract claim under the lease, it has that legal claim whether or not it can ultimately collect on it. See *Ed Peters Jewelry Co.*, 124 F.3d at 267 (noting that old corporation "unquestionably remained legally obligated to [the plaintiff] for its sales commissions, even if the lack of corporate wherewithal rendered the obligation unenforceable as a practical matter"). We see no sound basis—as a matter of equity or otherwise—for denying Ravinia the right to bring that claim now merely because

18

it seems unlikely that the claim would have been paid in a hypothetical scenario that didn't happen.

Finally, Embark cannot rely on one factor the *In re Acme* court weighed heavily. That court highlighted the fact that ALK was a closely-held, family-owned company that, faced with insolvency, had through these transactions been trying to preserve its business as a going concern and maintain the jobs and customer needs that depended on it. Id. at 494 (III) (B). Imposing liability on Acme, its successor, would disserve those interests and potentially destroy the livelihood of the small business owner, a result that the court viewed as inconsistent with equity. Id. at 494-95 (III) (B). Embark, unlike Acme, is not a closely-held, family-owned business, so the particular equities of applying successor liability under the circumstances in *In re Acme* are not present here.

*

In sum, Ravinia has presented evidence from which a jury could conclude that Embark is a "mere continuation" of Access Holdco under the established framework for applying that doctrine. And even assuming that framework is malleable, the trial court identified no compelling reason to reject successor liability based on other factors. The trial court therefore erred in holding that Embark was entitled to

19

summary judgment on this theory of liability, and we reverse the trial court's order on this issue. See, e.g., *Wilson*, 355 Ga. App. at 845-46 (3) (evidence was sufficient to submit "mere continuation" question to jury where both old and new companies were engaged in the same work, used the same brokers, and had the same employees, assets, and clients).

3. We turn now to Ravinia's alternative "de facto merger" theory of successor liability. We have described a de facto merger as one company being "absorbed" into another. See *Perimeter Realty*, 243 Ga. App. at 593 (5) (c). Four elements are required to establish a de facto merger: (1) a continuation of the seller corporation's enterprise, which involves "a continuity of management, personnel, physical location, assets, and general business operations"; (2) "a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, [which] ultimately com[es] to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation"; (3) the cessation and dissolution of the seller corporation "as soon as legally and practically possible"; and (4) the assumption by the purchaser of "those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of

20

normal business operations of the seller corporation." Id. (citation omitted); accord *Howard v. APAC-Ga., Inc.*, 192 Ga. App. 49, 50 (383 SE2d 617) (1989).

Although the facts viewed most favorably to Ravinia may establish the first, third, and fourth of these elements, those facts do not establish the second element. That element is established if the buyer pays for the assets with its own stock and that stock ends up being held by the shareholders of the seller, so that it becomes a "constituent part" of the buyer. *Perimeter Realty*, 243 Ga. App. at 593 (5) (c). But the transaction here did not involve any transfer of stock. Instead, the consideration paid for Access Holdco's assets was primarily debt forgiveness by ACP Insurance Finance. Further, because Altamont owned only 68 percent of Access Holdco, the remaining 32 percent interest in Access Holdco did not become a "constituent part" of Embark as the established de facto merger test requires.

Ravinia contends that the "continuity of shareholders" element is still met because the transaction really just converted debt owed to one Altamont-controlled entity into equity held by another Altamont-controlled entity. Because "Altamont controlled all of the entities involved," Ravinia suggests that the effect of the transaction here was practically the same as the required stock transfer, and so the transaction should satisfy the "continuity-of-shareholders" element. But Ravinia cites

only a single New York Appellate Division case for that novel view of our de facto merger test, *Tap Holdings, LLC v. Orix Fin. Corp.*, 109 A.D.3d 167, 176 (3) (N.Y. App. Div. 2013) (citation and punctuation omitted). That case is not controlling authority, and we don't find it persuasive. *Tap Holdings*, which addressed a different kind of transaction than the one before us here, reasons that the de facto merger question should be analyzed "in a flexible manner" to determine whether the "intent" was to "absorb and continue the operation of the predecessor." Id. But in our view, applying the de facto merger test in that way would effectively collapse that test into the continuation doctrine. We decline to merge those two doctrines, which are distinct under Georgia law. See, e.g., *Bullington*, 254 Ga. at 284 (delineating two doctrines as distinct theories of successor liability); *Perimeter Realty*, 243 Ga. App. at 593 (5) (c) (separately analyzing plaintiff's claims under each doctrine).

For these reasons, we agree with the trial court that Ravinia's de facto merger theory fails as a matter of law, and so we affirm the part of the trial court's order granting summary judgment as to this theory of successor liability.

*Judgment affirmed in part and reversed in part. McFadden, P. J., and Gobeil, J., concur.*