A01A1693. PARK PLACE CAFÉ, INC. et al. v. METROPOLITAN LIFE INSURANCE COMPANY et al.
(563 SE2d 463)

SMITH, Presiding Judge.

As lessees or former lessees of shopping center space, Park Place Café, Inc. d/b/a Park Place Café, McKendrick's, LLC d/b/a McKendrick's Steakhouse, Claudia Enterprises, Inc. d/b/a Mi Spia, and McKendrick Enterprises, Inc. d/b/a Elan of Atlanta brought this action for fraud and conversion against Metropolitan Life Insurance Company (MetLife) and Taylor & Mathis IV, L.P. In addition to compensatory damages, the plaintiffs sought punitive damages and attorney fees. During the time period relevant to this lawsuit, MetLife was either the sole or joint venture owner and landlord, and Taylor & Mathis managed the property. All four plaintiffs were either wholly or principally owned and managed by Douglas McKendrick.

They claimed that throughout the terms of the leases, the defendants deceitfully charged them "over and above what was believed to be the actual cost of the electricity." Defendants moved for summary judgment on several grounds. Among other things, they argued that no viable fraud claim was raised. The trial court granted the motion, and this appeal ensued. Because we conclude that appellants failed to meet the standard for maintaining a fraud claim and also that an action for conversion was not authorized under the facts of this case, we affirm.

The relevant facts are largely undisputed. Between 1979 and 1995, plaintiffs entered into lease agreements with appellees regarding space for four restaurant or bar establishments at Park Place Shopping Center. The lease provisions concerning billing and payment for electricity form the basis of this lawsuit. The first lease, executed in April 1979 by McKendrick Enterprises, concerned space for the operation of a nightclub named "Elan of Atlanta," which operated until April 1989[1] ("Elan" lease). Second, Park Place Café, Inc. entered into a lease in June 1989 ("Park Place" lease). This lease was amended and renewed in July 1994. Third, also in July 1994, appellant Claudia Enterprises, through a predecessor in interest, executed a lease for the operation of a restaurant called Mi Spia ("Mi Spia" lease). The prior lease executed by the predecessor of Claudia Enterprises was entered into in June 1990. Finally, appellant McKendrick's, LLC entered into a lease in April 1995 for the operation of McKendrick's Steakhouse ("Steakhouse" lease). It appears that the latter three leases remained in effect at the time this appeal was filed.

Section 4.8 of the Elan, Park Place, and Steakhouse leases provides in relevant part as follows:

> If Landlord elects to supply water, gas, electricity, sewer or scavenger service, or any other similar service, tenant agrees to purchase its requirements for the same from landlord, (or from an independent contractor designated by landlord) and to pay as additional rent the charges therefor[ ] when bills are rendered at applicable rates.

With the exception of minor spelling changes, the Mi Spia lease contains language identical to that quoted above, except that it is followed by the words "comparable to those charged by public utilities as if tenant were a direct customer thereof."

The shopping center was sold in February 1996 to Beacon Properties, and Taylor & Mathis continued to manage the property

---

[1] McKendrick admitted that Elan breached this lease.

for several months. Following this transaction, McKendrick discovered that plaintiffs had not been billed for electricity "at cost," contrary to his assumption, from the inception of the Elan lease in 1979 but that, according to McKendrick, the defendants "had been billing plaintiffs [for electricity] at a substantial profit." A Georgia Power "rate calculator," was used by Taylor & Mathis to calculate plaintiffs' monthly power bills. Under this formula, the monthly electricity statement sent to each plaintiff from Taylor & Mathis reflected a "fuel adjustment" added to the base electricity bill. According to McKendrick, he learned that the resulting bill from Taylor & Mathis "usually came out to be not double but somewhat greater than what the actual Georgia Power bill was divided by the kilowatt hours used for that period of time." In their brief on appeal, appellees acknowledge that use of the rate calculator resulted in a "sum-of-the-parts-greater-than-the-whole result" but argue that this result was "obvious to Mr. McKendrick as he looked at multiple electricity bills each month for" the businesses. It is undisputed that the method of computing the bills was provided by Taylor & Mathis to plaintiffs with each monthly electricity statement. McKendrick acknowledged that the billing statements showed "exactly how the number was computed."

1. We agree with appellees that they were entitled to summary judgment on the fraud claim. To prevail on such a claim, a plaintiff must show, among other things, that the defendant made a false representation with the intent to induce the plaintiff to act or refrain from acting. *Johnson v. Rodier*, 242 Ga. App. 496, 498 (2) (529 SE2d 442) (2000). Here, the record contains no evidence showing that appellees made any wilful misrepresentations concerning the billing of electricity. McKendrick admitted that he did not recall any conversations with Taylor & Mathis during the negotiation of the leases concerning the method of utility billing. He also acknowledged that appellees never lied to him about the method of computing electricity charges, nor did any representative tell him that they were not profiting on the rebilling of electricity.

Of course, "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." OCGA § 23-2-53. Appellants argue that under the particular circumstances of this case, appellees were under the duty to disclose that appellants would not be billed "at cost" for electricity. According to appellants, the crux of their fraud claim is "[a]ppellees' intentional failure to disclose their intent to seize upon the deliberate ambiguity of the term 'applicable rates' in the various leases as justification for calculating appellants' electricity bills in a manner that left appellees with a gigantic con-

cealed profit on its rebillings to appellants for electrical service." They maintain that this fraud began with the negotiation and execution of the leases and continued with monthly rebillings "that failed to reveal the huge markup that accompanied the bill."

We find no "particular circumstances" in this case imposing a "duty to communicate" on appellees. First, as discussed above, contrary to appellants' argument, the monthly rebillings *did* indicate that the electricity charges were adjusted upward, and McKendrick acknowledged that the statements he received over a period of several years reflected exactly how the charges were calculated. Second, nothing in the record shows that the parties were involved in a confidential relationship. Rather, the leases negotiated between the parties reflected arm's length transactions between a landlord and its tenants owned in whole or part by McKendrick, who had a master's degree in business administration and was a former CPA. These leases did not state that electricity bills would be billed to the tenants at the cost to the landlord but instead clearly stated that utilities would be billed at "applicable rates." And in fact, the leases contained at least two provisions, concerning taxes and common area maintenance, in which the landlord's costs were to be passed to the tenants on a pro rata basis. Furthermore, with respect to taxes, the Park Place, Mi Spia, and Steakhouse leases provided that the tenants were entitled, upon request, to a copy of the underlying tax bill. Although McKendrick argues that he once asked to see the Georgia Power bill and was told it was not his "business," no such actual cost language or access to bills language appears in the section of leases addressing utility charges. Regardless of the fact that other utilities such as water and sewage may have been billed to appellees at the cost to the landlord, the fact that electricity might not be billed to appellants at the landlord's actual cost was a matter specifically addressed by the leases.

> One cannot claim to be defrauded about a matter equally open to the observation of all parties where no special relationship or trust or confidence exists. . . . Further, in the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations, failure to do which will bar an action based on fraud.

(Citations and punctuation omitted.) *Life Ins. Co. of Virginia v. Conley*, 181 Ga. App. 152, 153 (351 SE2d 498) (1986). The lease provision concerning utility billing was "a matter equally open to the observation of all parties" at the time the leases were negotiated, 'and McKendrick has pointed to no evidence showing that he in any manner

made "an independent verification of" of his "assumptions" concerning this provision.

Relying on *Reeves v. Williams & Co.*, 160 Ga. 15 (127 SE 293) (1925), appellants seem to argue that "particular circumstances" imposing a duty to disclose on appellees arose because appellees failed to speak when they had knowledge that McKendrick had a differing contract interpretation from that held by appellees. In *Reeves*, the Supreme Court of Georgia did state that when a party to a contract "knows that the other understands the contract in a different sense from that in which he himself construes it, and remains silent, the former is held bound by the meaning which he knew was entertained by the opposite party." Id. at 21.

But here, the record does not show that appellees knew appellants held a different interpretation concerning the rebilling of electricity. McKendrick himself testified that he did not know what his understanding was of the term "applicable rates" at the time the leases were negotiated. He can hardly show that appellees knew his understanding, when he did not. Appellants argue that appellees defrauded them because appellees intended to calculate the utility charges in a manner that they knew or should have known would be contrary to the ordinary and reasonable interpretation the appellants were "*most likely* to apply." (Emphasis supplied.) But as discussed above, no evidence was presented that appellees had any knowledge of the interpretation placed on the contract by appellants, and the argument that they "should have known" of appellants' interpretation is not supported by *Reeves*, for that case requires the allegedly defrauding defendant to *know* that the other party harbors a different interpretation. Appellants simply have not shown an *intentional* misrepresentation by silence with regard to the phrase, "applicable rates," and summary judgment in appellees' favor on the fraud claim was authorized.

This conclusion applies to the Mi Spia lease as well, even though that lease contains language stating that the restaurant is to pay electricity charges "when bills are rendered at applicable rates comparable to those charged by public utilities as if the tenant were a direct customer thereof." Appellants presented no evidence in the trial court as to the amount Mi Spia would have paid if it had been a direct customer of Georgia Power. In fact, some evidence was presented that if small users of electricity were billed as if they were direct customers, their utility costs would be high, as small users did not receive the advantage of being billed like large ones.

We note other circumstances on which appellants rely in support of their contention that their fraud action is viable. They point out that after Beacon purchased the shopping center from MetLife in 1996, Beacon undertook a review of the utility billing practices used

by appellees and ultimately refunded $35,000 to the three remaining restaurants operated by appellants. Taylor & Mathis had continued managing the property for several months after the purchase by Beacon. This refund apparently represented the difference between the actual amount billed by Taylor & Mathis and the amount Beacon would have billed if Beacon had been responsible for billing from the date of acquisition. We do not find these facts controlling on the issue of whether "particular circumstances" imposed a duty to disclose on appellees. Appellees should not be held accountable for the choices of Beacon, a wholly separate business entity. Furthermore, Dudley Pryor, vice president and regional controller for Beacon, testified that the decision to issue the refund was made before the review of billing practices was completed, and Beacon ultimately decided that the electricity rebilling had been done in accordance with the lease agreements and that if they had waited, they would not have refunded any money to McKendrick. In fact, with respect to other tenants, Beacon continued to use the rebilling method used by appellees.

Appellants also rely on alleged statements by a Georgia Power representative at a meeting attended by representatives from Beacon and Taylor & Mathis that the rate calculator was to be used as a budgeting tool and was never intended to be used for rebilling tenants. But this statement was clearly hearsay having no probative value whatsoever. See, e.g., *In re Burton*, 271 Ga. 491, 494 (3) (521 SE2d 568) (1999).

2. We also agree with appellees that summary judgment was warranted on appellants' conversion claim. We have stated that "[a]t common law actions for trover for conversion related only to tangible things so that an action for conversion as to money would lie only as to 'withholding specific bills or coins. . . .' [Cits.]" *Kerr v. Cohen*, 249 Ga. App. 392, 394 (1) (a) (548 SE2d 17) (2001). But we have also found money to "be the subject of a conversion claim as long as the allegedly converted money is specific and identifiable." (Punctuation omitted.) *Hudspeth v. A & H Constr.*, 230 Ga. App. 70, 71 (2) (495 SE2d 322) (1997). In *Hudspeth*, plaintiff gave defendant a sum certain, $13,000, which was "specifically earmarked to purchase" certain interest in real property on plaintiff's behalf. Defendant converted this money to his own use by purchasing the interest himself. Id. We found the money at issue to be "sufficiently identifiable to support a claim in conversion. [Cit.]" Id. See also *Adler v. Hertling*, 215 Ga. App. 769, 773-774 (2) (451 SE2d 91) (1994) (conversion claim regarding money in account appropriate where money constituted specific identifiable funds). Here, however, the damages sought by appellants do not represent a specific, identifiable amount of money owned by them or "earmarked" for a particular purpose, which appellees have

appropriated for themselves. Summary judgment on the conversion claim was therefore authorized.

*Judgment affirmed. Barnes and Phipps, JJ., concur.*

DECIDED MARCH 18, 2002 —
RECONSIDERATION DENIED APRIL 8, 2002 — 

*Winkler, DuBose & Davis, H. James Winkler, C. Wilson DuBose, Jeffrey R. Davis*, for appellants.

*Powell, Goldstein, Frazer & Murphy, Simon H. Bloom, Jeffrey W. Kelley*, for appellees.