A04A0042, A04A0043. EQUIFAX, INC. v. 1600 PEACHTREE, L.L.C.; and vice versa.
(601 SE2d 519)

MILLER, Judge.

1600 Peachtree, L.L.C. (Landlord) sued Equifax, Inc. (Equifax) for breach of contract and fraud and to seek a declaratory judgment as to the enforceability of the terms of a certain contract. The trial court awarded partial summary judgment to Landlord on its breach of contract claim, granted partial summary judgment to Equifax on Landlord's fraud claim, and determined that the need for declaratory relief was moot. Equifax appeals and Landlord cross-appeals from that judgment. For the reasons that follow, we affirm in both cases.

When reviewing the grant or denial of summary judgment, we conduct a de novo review of the law and the evidence and construe the evidence and all reasonable deductions therefrom in favor of the nonmoving party. *Holbrook v. Stansell,* 254 Ga. App. 553 (562 SE2d 731) (2002). When reviewing a trial court's ruling on a legal question, we owe no deference to that court. *Suarez v. Halbert,* 246 Ga. App. 822, 824 (1) (543 SE2d 733) (2000).

---

So considered, the evidence shows that in 1994, Landlord became the owner of a building complex located at 1600 Peachtree Street in Atlanta (Old Equifax Building or Premises) after purchasing the Old Equifax Building from Equifax in a sale/leaseback transaction. As part of that 1994 transaction, Equifax and Landlord entered into a 15-year headquarters facility lease (original lease). In 1997, Equifax informed Landlord that it was contemplating erecting a new corporate headquarters and that it might want to vacate the Premises early (except for one of the three buildings). At that time, more than 12 years remained on the original lease. After negotiations, to accommodate Equifax's plan to build a new headquarters building, the parties executed a lease termination agreement on March 5, 1998. Equifax and Landlord also executed a space lease under which Equifax leased Building C of the Premises through December 31, 2013.

The lease termination agreement was a highly detailed contract that committed Equifax to certain payment or reimbursement structures to Landlord for two distinct periods. Under Section 4 of the lease termination agreement, Equifax guaranteed that Landlord would receive $263,480 each month as though the original lease had not terminated early. Section 4 (i) stated that Equifax

> hereby guarantees and agrees that . . . during the period commencing on the Termination Date and ending on March 31, 2004 (the "Period"):
>
> (i) The rents received by [Landlord] from [Equifax] under the Space Lease . . . between [Landlord] and [Equifax] . . . herewith together with the aggregate rent paid by third party tenants for all or parts of the Premises under leases . . . made pursuant to Section 5 hereof (the "Actual Rent") will on a monthly basis equal all Rent ($263,480.00 per month) and Additional Rent which would have been payable under the Lease (the "Original Rent") had the Lease not been terminated and [Equifax] hereby agrees and promises to pay to [Landlord] any deficiency between the Original Rent and the Actual Rent.

In addition, as to the expenditures for taxes, insurance, and certain other expenses, Equifax promised to pay Landlord "any deficiency between the Actual Charges Incurred and the Reimbursements." Similar terms and payment obligations were set forth for a second period, April 1, 2004, through December 31, 2013. Thus, under the

lease termination agreement, any rent Landlord received from third-party tenants was to be credited against Equifax's financial obligations to Landlord, subject to certain specified calculations. In sum, although the lease termination agreement released Equifax from its original lease with Landlord, Equifax undertook financial obligations that ensured that Landlord would receive a certain minimum amount of income, as though the original lease continued in effect, initially $263,480 per month ($3,161,760 per year), and a different amount later.

iXL Enterprises, a start-up Internet consulting firm, expressed interest in leasing the Old Equifax Building from Landlord. Before Landlord entered into a lease with iXL in December 1999, Landlord and Equifax executed an amended and restated lease termination agreement on December 6, 1999. At the same time, Landlord and Equifax also executed an amended and restated space lease to shorten the term of Equifax's occupancy of Building C of the Premises, allegedly to accommodate iXL's move-in schedule.

Under the amended and restated lease termination agreement, Equifax's financial obligations to Landlord continued. Like the lease termination agreement, Equifax's financial obligations to Landlord are offset by rent payments to Landlord from third-party tenants, specifically including iXL. The amended and restated lease termination agreement establishes a different payment schedule for the second term to "equal or exceed the following: [two subperiods with different amounts of annual rent, initially $955,945.75 through 12/31/08 thereafter $1,025,893.00 until 12/31/13]." Like its predecessor agreement, it contains provisions to address taxes, insurance, and expenses, as well as the costs of operation, maintenance, and repairs.

Problems arose between Landlord and iXL during iXL's tenancy. During 2000, iXL faced severe financial difficulties that purportedly resulted in substantial disputes between Landlord and iXL. Twice in 2001, Landlord filed suit against iXL over rent-related issues. The first suit was dismissed after iXL brought its rent current, and the second suit resulted in settlement between iXL and Landlord. Under the amended and restated lease termination agreement, Equifax had the right to approve the termination of the iXL lease. Equifax, by its counsel, expressly waived such right. Under a settlement and mutual release agreement entered by Landlord and iXL, iXL and Landlord agreed to the termination of iXL's lease and to the dismissal of their respective claims and counterclaims in the pending litigation, provided that iXL paid $1.8 million to Landlord. The settlement between iXL and Landlord became effective September 26, 2001.

Having settled with iXL, Landlord submitted written requests for payment to Equifax in conjunction with the supporting documentation as to Landlord's calculations of the amounts due from Equifax

under the amended and restated lease termination agreement. Subsequent to the fourth such notification, Equifax's counsel informed Landlord, for the first time, by a letter dated November 7, 2001, that Equifax no longer owed any amount to Landlord. Equifax's counsel asserted that as a result of Landlord's conduct in dealing with iXL and due to Landlord's unreasonable actions in attempting to re-lease the Premises under unreasonable terms, Equifax was discharged from liability as a guarantor under OCGA §§ 10-7-22 and 10-7-21. Citing OCGA § 10-7-22, Equifax claimed that by increasing Equifax's risk and exposing Equifax to greater liability, Landlord's actions had resulted in the discharge of Equifax as guarantor under the amended and restated lease termination agreement. Equifax also claimed that by changing the nature and terms of that agreement, under OCGA § 10-7-21, Landlord's "novation," obtained without the consent of the surety, had discharged Equifax from all liability to Landlord. Equifax asserted, "[u]nder both of these important and long-standing principles of Georgia law, Equifax has no further liability under the Guaranty Agreement."

After Equifax denied any liability to Landlord and refused to honor the terms of the amended and restated lease termination agreement, Landlord filed suit against Equifax. In Count I, Landlord asserted that Equifax had breached the amended and restated lease termination agreement by refusing to pay the actual amounts already due and by anticipatorily repudiating the agreement, "thereby rendering all amounts due under the Agreement fully payable." Under Count II, Landlord asserted a claim for negligent and intentional fraud and misrepresentation, alleging that Equifax had "made numerous representations and assurances to Landlord and its lenders that it would honor its obligations to Landlord, that it would guarantee a rental income stream to Landlord, and that its agreements with Landlord are and would be valid." Landlord claimed that Equifax willfully and knowingly made "numerous misrepresentations and omissions of material fact to Landlord."

Equifax answered and counterclaimed for declaratory relief to seek a judicial determination that the amended and restated lease termination agreement is, in fact, a guaranty which would then authorize Equifax to avail itself of the statutory protections afforded to guarantors. Equifax filed a motion for summary judgment, and Landlord moved for partial summary judgment on its breach of contract claim.

After a hearing, the trial court determined that the amended and restated lease termination agreement is not a "guaranty" within the

legal meaning of the term under Georgia law.[1] The trial court noted that the agreement "is not a guaranty in the sense that Equifax has guaranteed iXL's rent, rather it has guaranteed a rental stream, and iXL is the tenant that the parties contemplated would take over the premises, at least at the outset." Deciding that the clear and unambiguous terms of the contract established that it is not a guaranty, the trial court also found that "Equifax is not protected by the statutory discharge protections contained in OCGA § 10-7-20 et seq."

Equifax appeals and Landlord cross-appeals from that judgment.

### Case No. A04A0042

In its sole claim of error, Equifax contends that the trial court erred in holding as a matter of law that the amended and restated lease termination agreement referred to by Equifax as "ALTA" is not a guaranty within the meaning of OCGA § 10-7-1 et seq. Equifax argues that "[t]he plain language and structure of the ALTA, as well as the conduct and intent of the parties, demonstrate as a matter of law that the ALTA is a guaranty." Contending that the agreement at issue satisfies all the criteria of OCGA § 10-7-1, Equifax argues that:

> (1) Equifax has obligated itself to pay the debt of another (specifically identified in the ALTA as iXL), if that other does not pay; (2) consideration from Equifax's obligation flows both to Equifax (the termination of its prior lease on the Premises) and to iXL (Landlord's willingness to lease the Premises to iXL); and (3) the principal, iXL, remains bound to Landlord for the debt it owes under the iXL Lease (its rent) regardless of Equifax's undertaking. Therefore, the ALTA is a guaranty.

Equifax further contends that "once iXL agreed to pay the rent with respect to the Premises, Equifax became the guarantor of iXL's obligation."[2]

Under the rules of contract construction, where the language in an agreement is clear and unambiguous, no construction is required

---

[1] Equifax's citation to law from other jurisdictions is unpersuasive, since Section (h) of the agreement requires the construction and enforcement of the agreement under Georgia law.

[2] Equifax refused to execute a document entitled "GUARANTY," under which Equifax would have unconditionally guaranteed payment to Landlord, "notwithstanding, without limitation, the . . . incompetency of . . . iXL, or any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of . . . iXL or by any defense which iXL may have by reason of the order, decree or decision of any court or administrative body resulting from such proceeding."

or permitted by the trial court. *Lothridge v. First Nat. Bank of Gainesville*, 217 Ga. App. 711, 714 (3) (a) (458 SE2d 887) (1995). Where the language of a contract is clear and unambiguous and capable of only one reasonable interpretation, construction of a contract is a matter of law reserved for the trial court. *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 242 (1) (503 SE2d 877) (1998).

The dispositive issue is whether the agreement in issue is a guaranty. "A contract of guaranty is primarily one to pay the debt of another, which may be due and payable by the principal debtor to the creditor, upon the default of the principal debtor." (Citations omitted.) *Hartsfield Co. v. Shoaf*, 184 Ga. 378, 380 (191 SE 693) (1937). By definition,

> The contract of suretyship or guaranty is one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit or indulgence or other benefit given to his principal, the principal in either instance remaining bound therefor. Sureties, including those formerly called guarantors, are jointly and severally liable with their principal unless the contract provides otherwise. There shall be no distinction between contracts of suretyship and guaranty.

OCGA § 10-7-1. "In determining whether a contract is one of guaranty or of indemnity, the language of the instrument should first be considered, and the surrounding circumstances should be taken into account only if the language is indefinite or ambiguous." (Citation omitted.) *Nat. Bank of Monroe v. Wright*, 77 Ga. App. 272, 276 (2) (48 SE2d 306) (1948). Thus, absent ambiguity, we must look to the four corners of the document.

Here, looking to the four corners of this agreement, there is neither indefiniteness nor ambiguity because the contract clearly delineates the obligations of both parties through 2013, specifically the financial obligations to which Equifax consents. As Equifax correctly points out, Sections 4 (a) and 4 (b) as well as Section 6 each begin by saying: "LESSEE hereby guarantees and agrees." In using that wording, each section memorializes the financial obligations and commitments that belong to Equifax. More specifically, Section 4 (a) (i) states the following:

> LESSEE hereby guarantees and agrees that, notwithstanding the termination of the LEASE[3] or the expiration of any earlier termination of the Amended and Restated Space Lease, during the period commencing on the Termination Date and ending on March 31, 2004 . . . (the "First Period"): The rents received by LESSOR from LESSEE under the Amended and Restated Space Lease together with the aggregate rent paid to LESSOR by iXL Enterprises, Inc. . . . or by any other third party tenants for all or parts of the Premises under the iXL Lease and/or any other leases (collectively, "Third Party Leases") with any such third party tenants . . . during the First Period will, on an annual basis, equal all Rent [i.e., $3,161,760.00 per annum . . .] and Additional Rent which would have been payable under the LEASE (the "Original Rent") had the Lease not been terminated. . . .

Thus, Equifax agreed to compensate Landlord for any deficiency should Landlord receive an aggregate sum less than the original rent due under the 1994 lease.

Similarly, during a second term, Equifax obligates itself to ensure Landlord's receipt of fixed and certain amounts. Section 4 (b) states in pertinent part,

> LESSEE hereby guarantees and agrees that, notwithstanding the termination of the LEASE or the expiration or any earlier termination of the Amended and Restated Space Lease, during the period commencing on April 1, 2004 and ending on December 31, 2013 (the "Second Period"): (i) The base rents paid to LESSOR by iXL and/or other third party tenants under Third Party Leases . . . will, for the indicated periods, equal or exceed the following: [$955,945.75 per year from 4/1/04-12/31/08 and $1,025,893.00 per year and from 1/1/09-12/31/13].

By assuring that Landlord would receive a base amount equal to a specified amount, Equifax obligated itself to a continuation of its financial commitments to Landlord through 2013, regardless of whether the iXL lease terminated prematurely and regardless of whether part or all of the Premises were leased to third-party tenants.[4]

---

[3] The amended and restated lease termination agreement defines "LEASE" as the "HEADQUARTERS FACILITY LEASE" that was "made and entered into the 11th day of March, 1994."

[4] J. Bruce Williams, Jr. testified that Equifax incurred financial obligations to Landlord

While it is true that the document uses the phrases "Lessee guaranties" and "Lessee guarantees [sic]," extracting terms and phrases from their context is disfavored because "the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." (Citation and punctuation omitted.) *Bumgarner v. Green*, 227 Ga. App. 156, 159 (1) (489 SE2d 43) (1997); OCGA § 13-2-2 (4). When read and considered in context, those phrases do not transform the agreement into a guaranty. Equifax did not guarantee to pay the debt of another upon that party's default. Rather, Equifax "guarantee[d] and agree[d]" to pay Landlord until the end of the "Second Period," any shortfall between what Landlord would have received from Equifax had the original lease not been terminated prematurely.

Notwithstanding Equifax's claim to the contrary, the amended and restated lease termination agreement is not, as Equifax argues, "a secondary or collateral obligation" that arises "only if iXL does not pay under its primary and independent obligation to Landlord." On the contrary, the agreement explicitly provides for the survival of Equifax's obligations to Landlord even if the iXL Lease terminated prematurely as, in fact, did occur. As Section 9 (m) states plainly:

> The duties and obligations of [Equifax] under this AGREE-MENT shall not be terminated, reduced, or otherwise affected by the termination or cancellation of either the iXL Lease or the Amended and Restated Space Lease by iXL or [Equifax], respectively, or otherwise, it being the understanding of the parties that this AGREEMENT shall survive any such termination or cancellation of either the iXL Lease or the Amended and Restated Space Lease. . . .

Therefore, Equifax's obligation to Landlord is primary, not secondary, and is not triggered by another's default. Compare *Ramirez v. Golden*, 223 Ga. App. 610-611 (478 SE2d 430) (1996). Nothing in the 27-page document refers to Equifax's financial obligations to Landlord as collateral or secondary to iXL's obligations. Equifax is the principal obligor under the amended and restated lease termination agreement. It is Equifax who remains primarily bound for certain predetermined, specified amounts due Landlord. Although Equifax's financial obligation to Landlord fluctuates according to the payments that Landlord obtains from third-party tenants, including iXL, Equifax

---

through March 31, 2004, for Buildings A and B and through December 31, 2013, for Building C. Williams explained that "[a]ny amounts paid by iXL or other third-party tenants would be deducted from what Equifax owed."

remains ultimately liable for any deficiency, i.e., an amount less than what Landlord would have received from Equifax had the original lease remained in effect. The agreement plainly contemplates and calculates what Equifax would owe Landlord in the event that iXL's lease terminated on the date scheduled or else terminated prematurely. Thus, the plain, clear, unequivocal terms of the document belie Equifax's assertions that Equifax's obligations are collateral. See *B & C Tire & Battery v. Cooper Tire &c.*, 212 Ga. App. 228, 230 (1) (441 SE2d 468) (1994) (no construction permitted when contract terms are plain and unambiguous). Equifax's financial obligations and commitments to Landlord remain in effect regardless of whether any tenant including iXL pays Landlord and regardless of whether the Premises are fully leased to tenants. Compare *Town Center Assoc. v. Workman*, 227 Ga. App. 55, 56-58 (1) (487 SE2d 624) (1997).

To support its contention that the document at issue is a guaranty, Equifax complains about Landlord's treatment of iXL, claiming "Landlord failed to properly reimburse iXL for improvements iXL made to the Premises." Equifax asserts that "Landlord's conduct underscores the reason that Equifax needs guaranty protections — it relinquished all control over the Premises, but retained obligations to Landlord." The amended and restated lease termination agreement does afford rights to Equifax against third-party tenants including iXL.[5] Equifax, however, elected to waive such rights as to iXL. As Equifax concedes in its appellate brief, "[s]o as not to hold up the settlement, Equifax waived its rights under the ALTA to consent to the termination of the iXL Lease." See generally *Underwood v. NationsBanc Real Estate Svc.*, 221 Ga. App. 351, 353 (471 SE2d 291) (1996) (protection afforded by OCGA §§ 10-7-21, 10-7-22 can be waived in advance at the time a guarantor signs the instrument). Having read and considered the document as a whole, we find that the amended and restated lease termination agreement is not a guaranty. The trial court did not err in so finding.

## Case No. A04A0043

In this cross-appeal, Landlord contends that the trial court erred in granting summary judgment to Equifax on Landlord's fraud claim because material issues of fact remain with respect to that claim. Landlord contends that the record contains evidence that Equifax made assurances to and agreements with Landlord with no intention

---

[5] Subject to certain timing and notice provisions and subject to the precondition that Equifax not be in default on its own rent, the agreement affords Equifax certain rights relating to third-party tenants. Section 7 (f) specifically provides Equifax with "the right to pursue the collection of rent under the Third Party Lease and/or to enforce such Third Party Lease. . . ."

of performing them and misled Landlord into believing that Equifax would stand behind its financial commitments. Landlord asserts that: (1) Equifax duped Landlord into letting Equifax out of its original lease when Equifax had no intention of honoring its financial obligations under the lease termination agreement; and (2) Equifax misled Landlord during the period of negotiations with iXL by providing false assurances that Equifax would fulfill its obligations under the amended and restated lease termination agreement when it had no intention of doing so, and while setting up the defense of discharge. Citing the November 7, 2001 letter from Equifax's counsel as evidence, Landlord claims that "Equifax had no intention of honoring the Amended Termination Agreement *ab initio*, and intended to claim it was not 'authorized' by Equifax." Landlord claims that it kept Equifax "fully informed" of iXL's financial problems and asserts that Equifax advised Landlord to "do the best you can" in negotiating with iXL, claims that Equifax would later dispute.[6]

Notwithstanding Landlord's claim to the contrary, we do not find that the November 7, 2001 letter from Equifax's counsel constitutes proof that Equifax did not intend to perform under the terms of either agreement at the time of their execution. In fact, Equifax did perform under the amended and restated lease termination agreement by paying $492,843.18, the amount requested by Landlord for 2000. See, e.g., *Wyse v. Potamkin Chrysler-Plymouth*, 189 Ga. App. 64, 65 (2) (374 SE2d 785) (1988). Landlord failed to present evidence from which a jury could find that Equifax intended to deceive Landlord at the time that it signed the restated agreement in 1999. See *Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 595-596 (10) (533 SE2d 136) (2000). Thus, Landlord failed to offer evidence to demonstrate that Equifax lacked a present intent to perform at the time that Equifax signed either document. See *Rogers v. deMonteguin*, 193 Ga. App. 480, 481-482 (1) (388 SE2d 10) (1989). Thus, this claim must fail. See id.

"The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise any breach of a contract would amount to fraud." (Citations and punctuation omitted.) *Beltz v. Atlanta Coachworks Corp.*, 172 Ga. App. 604, 605 (2) (323 SE2d 901) (1984). In the absence of a special relationship or confidence between parties, a matter equally open to the observation of all parties, such as the terms of a written contract,

---

[6] Landlord claims that it settled with iXL due to "iXL's dire financial straits, the certainty that iXL would file for bankruptcy if the dispute with Landlord was not settled, and, more importantly, the assurances from Equifax that it would stand behind its obligations."

will generally not support a claim of fraud. *Life Ins. Co. of Virginia v. Conley*, 181 Ga. App. 152, 153 (351 SE2d 498) (1986). Even assuming only for purposes of summary judgment that Equifax, after executing the amended and restated lease termination agreement, made misleading misrepresentations to Landlord and further assuming that Landlord can prove that Equifax somehow planned in advance with iXL to establish the defense of discharge, such conduct reflects, at most, hard-nosed business tactics or perhaps a divergent interpretation of the agreement, not fraud. Equifax was under no duty to disclose its own interpretation of its contractual obligations or the fact that it was contemplating asserting the defense of discharge. See *Park Place Cafe v. Metropolitan Life Ins. Co.*, 254 Ga. App. 733, 735-737 (1) (563 SE2d 463) (2002) (fraud claim fails where defendants had no duty to disclose their interpretation of contract terms). Landlord's remedy here sounds in contract, not tort.

*Judgments affirmed in both cases. Andrews, P. J., and Ellington, J., concur.*

DECIDED JUNE 29, 2004 — ▪

*Kilpatrick Stockton, William H. Boice, Steven D. Moore*, for appellant.

*Sutherland, Asbill & Brennan, Richard L. Robbins, Julianne N. Belaga, Brian D. Burgoon*, for appellee.